[Civil No. 3545.   Filed June 17, 1935.]

[46 Pac. (2d) 118.]

SOUTHERN METHODIST HOSPITAL AND SANATORIUM OF TUCSON, a Corporation, Appellant, v. MAX EUGENE WILSON, a Minor, by His Guardian ad Litem, BERYL E. WILSON, Appellee.

508

Mr. Samuel L. Pattee and Mr. Tom Chambers, for Appellant.

Messrs. Darnell & Nave and Mr. L. V. Robertson, for Appellee.

LOCKWOOD, C. J.—Max Eugene Wilson, a minor, hereinafter called plaintiff, brought suit through his guardian *ad litem,* Beryl E. Wilson, against the Southern Methodist Hospital and Sanatorium of Tucson, a corporation, hereinafter called defendant, to recover damages for personal injuries, which were claimed to have been caused by the negligence of the defendant. It was alleged that plaintiff was seriously burned and injured through the negligence of some person or persons in defendant's employ; the particular person responsible being unknown to the plaintiff. These persons were designated by the fictitious names of Doe and Roe, and were never served; the case being conducted as one against the defendant only. The defendant answered, denying the allegation of negligence and setting up that it is, and was at all times concerned, a corporation incorporated for the conducting of a hospital and sanatorium in the city of Tucson as a charitable and religious institution, and that it at all times conducted and still conducts such hospital and sanatorium as such an institution; that it has no capital stock or stockholders, and that its affairs are conducted by a board of commissioners; that it was not organized for the purpose of profit, and is not authorized to and never has made any profit or gain whatever; that it is supported by voluntary contributions by the Methodist Episcopal Church, South, and its varied organizations, by outside contributions, and by reasonable charges made to patients whenever they are able to pay such charges; and that its entire income is expended in the conducting of its hospital aforesaid. It further alleged that at the time of the injury to plaintiff it had exercised, and at all times did exercise, due care and caution in selecting the physicians, surgeons, nurses, attendants and employees in and about its hospital. To this answer

plaintiff replied, putting in issue the allegations as to the religious and charitable nature of the institution.

At the trial the following facts appeared: The mother of plaintiff, then about to be confined, had arranged with the defendant, through her physician, to be cared for at defendant's hospital during her confinement, and shortly before the birth of plaintiff was taken to the hospital. After the birth of plaintiff he was taken from the room in which he was born to another used for the purpose of caring for infants after birth, and there placed in a basket used to hold newly born infants. While in the basket, in some manner unknown to any of the witnesses who testified, he suffered a very severe burn, the evidence tending to show that it occurred by reason of his contact with a hot water bottle. There was no serious denial by defendant that those burns must have been the result of the negligence of some person, and the reasonable conclusion is that it was someone employed by defendant as a nurse or attendant. The medical testimony tends to show that the burn was of a very severe nature, and that it will impair the physical condition of plaintiff to a considerable degree most of his life; the only possible chance for escape from such a result being the rather doubtful one of one or more operations. The evidence further shows that plaintiff's mother expected to pay and had contracted to pay for the services which she received during her confinement in defendant's hospital.

In support of its defense that it was exempt from liability as a charitable institution, defendant introduced its articles of incorporation and showed by uncontradicted evidence that in the conduct of its hospital, while it made a charge against patients who had the ability to pay, it treated as many as it could who were not able to pay, or could only pay a part of the usual charges, and that it took care of what are

usually called charity patients so far as possible in the same manner as the patients who paid its charges. It also appeared that the charges it did make were not based upon the idea of making a profit; that it never did make a profit therefrom, and that whatever sums it thus received were entirely insufficient to maintain the institution, so that for the purpose of continuing its operations it received contributions from the Methodist Episcopal Church, South, and others who desired to aid in its maintenance.

When the case was submitted to the jury, however, the court instructed it, among other things, as follows:

" . . . You are instructed that under the law you must return a verdict for plaintiff; that in doing that you will disregard all evidence in this case concerning the charitable or religious nature and character of this defendant and consider the facts in the this case the same as if said Southern Methodist Hospital and Sanitorium of Tucson were a private institution and not religious or charitable. In other words, gentlemen, that this defendant is a charitable institution is no defense in this case. If the defendant, . . . accepted the mother of Max Eugene Wilson as a pay patient, . . . and attempted to care for her upon the basis of her paying for such care and attention . . . , under the law the defendant is liable. . . . "

There are some twenty-eight assignments of error, but since, in our opinion, the case must be determined upon questions raised by the instruction just quoted, we think it unnecessary to set them forth at length. These questions may be thus stated: (1) Is a hospital, maintained as a charitable institution and not for profit, exempt from liability for the negligence of its employees, when such negligence results in injury to any of its patients, if it has used reasonable care in the selection of such employees? (2) If it is, does the fact that plaintiff was a paid patient alter the rule in regard to defendant's liability? (3) If charitable

institutions are exempt under the circumstances set forth in the above question, is defendant such an institution?

We consider first the rule in regard to the exemption of charitable institutions from liability, as stated in the first question. This is a matter of first impression in Arizona, and for this reason we are at liberty to review the cases passing upon such questions and adopt such rule as seems to us most consistent with reason and justice, unhampered by any previous expression of our own upon the subject. Upon an examination of the authorities it appears that there is an irreconcilable conflict therein, but that the overwhelming weight, so far as numbers are concerned, supports the general doctrine of exemption from liability. Indeed, this is frankly conceded by counsel for plaintiff, but they insist that the rule for which they contend, although decidedly the minority one, is better founded upon reason than the contrary one. So far as we have been able to discover, the only jurisdictions which hold that charitable institutions are liable for the negligence of their employees on the same basis as private profit making corporations are Rhode Island, Alabama, Oklahoma, Minnesota, Florida and perhaps Georgia. *Glavin* v. *Rhode Island Hospital,* 12 R. I. 411, 34 Am. Rep. 675; *Basabo* v. *Salvation Army,* 35 R. I. 22, 85 Atl. 120, 42 L. R. A. (N. S.) 1144; *Tucker* v. *Mobile Infirmary Assn.,* 191 Ala. 572, 68 So. 4, 13, L. R. A. 1915D 1167; *City of Shawnee* v. *Raush,* 101 Okl. 60, 223 Pac. 354; *Mulliner* v. *Evangelischer Diakonniessenverein,* 144 Minn. 392, 175 N. W. 699; *Geiger* v. *Simpson Methodist-Episcopal Church,* 174 Minn. 389, 219 N. W. 463, 62 A. L. R. 716; *Parrish* v. *Clark,* 107 Fla. 598, 145 So. 848; *Morton* v. *Savannah Hospital,* 148 Ga. 438, 96 S. E. 887. Probably the leading case taking this view is that of *Glavin* v. *Rhode Island*

*Hospital, supra.* The basis of this decision is stated by the court as follows:

"This brings us to the important question whether the hospital does enjoy any peculiar exemption from liability. The claim that it enjoys such an exemption rests upon two grounds: to wit, on the ground of public policy, and on the ground that the hospital had no funds except such as are exclusively dedicated to the charitable uses for which it was established, and which therefore cannot be applied to indemnify a patient who has been injured by the negligence or malpractice of a physician or surgeon, or of a medical or surgical interne.

"The first ground is the ground on which the plaintiff was nonsuited. The argument is that hospitals, like the Rhode Island Hospital, are a public benefit; but if they are liable for the torts of the physicians or surgeons attendant on them, or of the medical or surgical internes, or of their nurses and other servants, people will be discouraged from voluntarily contributing to their foundation and support, and therefore public policy demands that they shall be exempted from liability. In our opinion the argument will not bear examination. The public is doubtless interested in the maintenance of a great public charity, such as the Rhode Island Hospital is; but it also has an interest in obliging every person and every corporation which undertakes the performance of a duty to perform it carefully, and to that extent, therefore, it has an interest against exempting any such person and any such corporation from liability for its negligences. The court cannot undertake to say that the former interest is so supreme that the latter must be sacrificed to it. Whether it shall be or not is not a question for the court, but for the legislature. . . .

"In view of these later decisions the question here is, whether a charitable corporation, like the Rhode Island Hospital which holds its property for the charity, is more highly privileged than a corporation created for public purposes, which holds its property for such purposes; whether, in fact, because it holds its property for the charity, it is relieved from all responsibility for the torts or negligences of its offi-

cers, trustees, agents or servants. We have come to the conclusion, after much consideration, that it is not. We understand the doctrine of the cases which we have just been considering to be this: that where there is duty, there is, *prima facie* at least, liability for its neglect; and that when a corporation or *quasi* corporation is created for certain purposes which cannot be executed without the exercise of care and skill, it becomes the duty of the corporation or *quasi* corporation to exercise such care and skill; and that the fact that it acts gratuitously, and has no property of its own in which it is beneficially interested, will not exempt it from liability for any neglect of the duty, if it has funds, or the capacity of acquiring funds, for the purposes of its creation, which can be applied to the satisfaction of any judgment for damages recovered against it. We also understand that the doctrine is that the corporate funds can be applied, notwithstanding the trusts for which they are held, because the liability is incurred in carrying out the trusts and is incident to them. . . . ''

This case was followed in *Tucker* v. *Mobile Infirmary Assn., supra,* and the principles involved were discussed at great length; the court finally coming to the conclusion that, so far at least as paying patients in a charitable institution were concerned, it was liable, and saying:

''As previously stated in this opinion, we recognize that the weight of authority in this country is opposed to the conclusion we have here reached. This within itself is, of course, of much force, and has led us to a very careful review of the cases, and a consideration of the principles upon which they may be said to rest. But it sometimes happens that in order to reach a safe harbor one must row against the current. We have here endeavored to show that the theory upon which those cases are founded does not measure with the rule of reason or sound logic, as we view it. While many of them reach the same end, yet they do so by entirely divergent routes and upon theories entirely inconsistent one with the other. For these courts we

have the highest respect, but we cannot follow in their wake.

"In the Powers case [(C. C. A.) 109 Fed. 294, 65 L. R. A. 372], *supra,* the writer of the opinion said:

" 'Though we feel constrained to differ from the reasoning followed by some other courts in reaching the same conclusion, we are not unmindful that the identity of conclusion reached, though by different roads, is the strong proof of its correctness. Doubtless a weight of authority is more overwhelming if it is identical in reasoning as well as in result, but identity of result is in itself no mean argument for its justice.'

"Generally speaking, the language of the writer may be accepted as correct; but in this particular instance, upon this interesting subject, the different views are so divergent and so inconsistent that in our minds the weight of authority has lost its force, and we are rather impressed by a reading of the decisions that the courts holding to the majority view have been rather straining at legal principles in order to reach what they seem to think a desirable and just result. With the result the court cannot feel concerned. It is not for this court to create exemptions or declare immunity from liability in a case of this character as shown by this record, and, if considered to be so violently opposed to the public good, it is a matter that may be addressed to the legislative department. Some of the authorities express a doubt that the advantages to the public would justify a wrong to an individual, thus placing the institution above the law, as it were. But, however this may be viewed, we think the following observation made by Justice POTTER in the Glavin case, *supra,* is most pertinent here:

" 'Is it not better and safer for the court to follow out the analogies of the law, and then, if the Legislature is of opinion that public policy demands a limitation of this liability, it is in its power to interfere and grant an entire or a partial exemption.' "

In that case, however, a most vigorous dissenting opinion was filed. The Oklahoma, Florida, Minnesota and Georgia cases simply follow those from which we

have just quoted, making no additions to the reasoning contained therein.

When it comes to the states holding the contrary view, the opinions are so numerous that the only difficulty is in choosing therefrom the ones which most clearly state the rule and give. the reasons therefor. *Candal De Lopez* v. *Sociedad Espanola de Auxilio Mutuo y Beneficencia,* (C. C. A.) 45 Fed. (2d) 331; *Plant System Relief Dept.* v. *Dickerson,* 118 Ga. 647, 45 S. E. 483; *Hamburger* v. *Cornell University,* 240 N. Y. 328, 148 N. E. 539, 42 A. L. R. 955; *Taylor* v. *Protestant Hospital Assn.,* 85 Ohio St. 90, 96 N. E. 1089, 39 L. R. A. (N. S.) 427; *New England San.* v. *Stoneham,* 205 Mass. 335, 91 N. E. 385; *Parks* v. *Northwestern University,* 218 Ill. 381, 75 N. E. 991, 4 Ann. Cas. 103, 2 L. R. A. (N. S.) 556; *Sibilia* v. *Paxton Memorial Hospital,* 121 Neb. 860, 238 N. W. 751; *Roberts* v. *Ohio Valley General Hospital,* 98 W. Va. 476, 127 S. E. 318, 42 A. L. R. 968; *Lindler* v. *Columbia Hospital,* 98 S. C. 25, 81 S. E. 512; *Downes* v. *Harper Hospital,* 101 Mich. 555, 60 N. W. 42, 45 Am. St. Rep. 427, 25 L. R. A. 602; *Gable* v. *Sisters of St. Francis,* 227 Pa. 234, 75 Atl. 1087, 136 Am. St. Rep. 879; *Jensen* v. *Maine Eye & Ear Infirmary,* 107 Me. 408, 78 Atl. 898, 33 L. R. A. (N. S.) 141; *Adams* v. *University Hospital,* 122 Mo. App. 675, 99 S. W. 453; *Abston* v. *Waldon Academy,* 118 Tenn. 24, 102 S. W. 351, 11 L. R. A. (N. S.) 1179; *Cook* v. *John N. Norton Memorial Infirmary,* 180 Ky. 331, 202 S. W. 874, L. R. A. 1918E 647; *Nicholson* v. *Atchison, Topeka & Santa Fe Hospital Assn.,* 97 Kan. 480, 155 Pac. 920, L. R. A. 1916D 1029; *Morrison* v. *Henke,* 165 Wis. 166, 160 N. W. 173; *Mississippi Baptist Hospital* v. *Moore,* 156 Miss. 676, 126 So. 465, 67 A. L. R. 1116; *Wharton* v. *Warner,* 75 Wash. 470, 135 Pac. 235; *Nicholas* v. *Deaconess Home & Hospital,* 281 Mo. 182, 219 S. W. 643; *Greatrex* v. *Evangelical Deaconess Hos-*

*pital,* 261 Mich. 327, 246 N. W. 137, 86 A. L. R. 487; *D'Amato* v. *Orange Memorial Hospital,* 101 N. J. Law 61, 127 Atl. 340; *Steele et ux.* v. *St. Joseph's Hospital,* (Tex. Civ. App.) 60 S. W. (2d) 1083. While the courts in all the cases above quoted agree as to the rule, they differ as to the reason therefor. Upon an examination and comparison of these cases, and of many others to the same effect, we find them to fall into three classes.

The first uphold the rule on what is known as the "trust fund theory." The argument in favor of this is well stated in *Parks* v. *Northwestern University, supra,* as follows:

" . . . The funds and property thus acquired are held in trust, and cannot be diverted to the purpose of paying damages for injuries caused by the negligent or wrongful acts of its servants and employees to persons who are enjoying the benefit of the charity. An institution of this character, doing charitable work of great benefit to the public without profit, and depending upon gifts, donations, legacies, and bequests made by charitable persons for the successful accomplishment of its beneficial purposes, is not to be hampered in the acquisition of property and funds from those wishing to contribute and assist in the charitable work by any doubt that might arise in the minds of such intending donors as to whether the funds supplied by them will be applied to the purposes for which they intended to devote them, or diverted to the entirely different purpose of satisfying judgments recovered against the donee because of the negligent acts of those employed to carry the beneficent purpose into execution."

The second theory offered in support of the rule is what is known as that of "implied waiver." This theory and the reasoning supporting it are set forth in *Powers* v. *Massachusetts Homeopathic Hospital,* 109 Fed. 294, 303, 47 C. C. A. 122, 65 L. R. A. 372, in the following language:

" . . . That a man is sometimes deemed to assume a risk of negligence, so that he cannot sue for damages caused by the negligence, is familiar law. Such is the case of common employment, and such are the cases of athletic sports and the like, put by Pollock on page 150 et seq. Such is the case at bar. One who accepts the benefit either of a public or of a private charity enters into a relation which exempts his benefactor from liability for the negligence of his servants in administering the charity; at any rate, if the benefactor has used due care in selecting those servants. To paraphrase the illustration put by the learned judge before whom this case was tried, it would be intolerable that a good Samaritan, who takes to his home a wounded stranger for surgical care, should be held personally liable for the negligence of his servant in caring for that stranger. Were the heart and means of that Samaritan so large that he was able, not only to provide for one wounded man, but to establish a hospital for the care of a thousand, it would be no less intolerable that he should be held personally liable for the negligence of his servant in caring for any one of those thousand wounded men. We cannot perceive that the position of the defendant differs from the case supposed. The persons whose money has established this hospital are good Samaritans, perhaps giving less of personal devotion than did he, but, by combining their liberality, thus enabled to deal with suffering on a larger scale. If, in their dealings with their property appropriated to charity, they create a nuisance by themselves or by their servants, if they dig pitfalls in their grounds and the like, there are strong reasons for holding them liable to outsiders, like any other individual or corporation. The purity of their aims may not justify their torts; but, if a suffering man avails himself of their charity, he takes the risks of malpractice, if their charitable agents have been carefully selected."

The third reason for the rule is that of "public policy." We think the reasoning of the cases which take this view is best stated in *Hearns* v. *Waterbury Hospital,* 66 Conn. 98, 33 Atl. 595, 603, 31 L. R. A. 224.

The ordinary layman, considering only general principles of abstract justice and common sense would assume that he was responsible for the result of his own acts, but that it was unjust to hold him to accountability for those of another. Early in the history of English law, however, this principle was modified by the introduction of the doctrine known as that of *"respondeat superior."* This doctrine, with its history and the reasons therefor, are well set forth in the case just cited, as follows:

" . . . The law which makes one responsible for an act not his own, because the actual wrongdoer is his servant, is based on a rule of public policy. The liability of a charitable corporation for the defaults of its servants must depend upon the reasons of that rule of policy, and their application to such a corporation. The rule is distinguished as the doctrine of *respondeat superior*, although the phrase is used broadly in reference to any relation of principal and agent, thereby causing much confusion. Here we used it in the narrow meaning suggested by its origin. . . . It recognized an injustice, and declared a rule of public policy, i. e., an injury done by one who is irresponsible must be answered for by his superior, when for his own convenience and emolument that superior has given the wrongdoer the opportunity of committing the injury. This rule of public policy modified the development of the law of master and servant from the beginning, and in this way infused into the law of agency a sort of fictitious agency, depending, not on the principle of justice that makes one responsible for his own act, but on a rule of public policy which, under certain circumstances, estops one from showing that the act in question was not his own. This view is suggested by the opinion of BEST, C. J., in *Hall* v. *Smith* [2 Bing. 156], *supra,* and is the occasion of his emphatic declaration that *respondeat superior* is bottomed on the principle that he who expects to derive the advantage from an act done for him by another must answer for any injury which a third person sustains from it. The reasons for the rule have been

differently stated by others. In *Maximilian* v. *Mayor, etc.* [62 N. Y. 160, 20 Am. Rep. 468], *supra,* the rule is based upon the right which the employer has to select his servants, to discharge them if not competent, and to control them while in his employ. In Dicey, Parties, rule 102, p. 446, the liability is stated as 'analogous to the liability of an owner for injuries committed by animals belonging to him. Neither the master nor owner is liable because he has himself done the particular act complained of. He is responsible because the wrong is the result of his having in the one case employed the incompetent servant, and in the other kept an animal of habits injurious to his neighbors.' Here the policy stated seems to be that the master should not only be liable for his negligence in the employment of servants, but should be held as a guarantor that none employed by him should abuse their opportunities. And a similar notion is expressed in Wood, Mast. & S. § 277, i. e., that the penalty of liability is imposed in order to secure in the master 'the exercise of proper care and diligence in the selection and retention of his agents.' Whart. Neg. § 157, gives, as the reason of the policy, that 'he who puts in operation an agency which he controls, while he receives its emoluments, is responsible for the injuries it incidentally inflicts,' relying on Lord Brougham's statement in *Duncan* v. *Findlater* [6 Clark & F. 894], 'I am liable for what is done for me and under my orders by the man I employ, for I may turn him from that employ when I please; and the reason that I am liable is this, that by employing him I set the whole thing in motion, and what he does, being done for my benefit and under my direction, I am responsible for the consequences of doing it.'

"This defendant does not come within the main reason for the rule of public policy which supports the doctrine of *respondeat superior.* It derives no benefit from what its servant does, in the sense of that personal and private gain which was the real reason for the rule. Again, so far as the persons injured are concerned, especially if they be patients at the hospital, the defendant does not 'set the whole thing in mo-

tion,' in the sense in which that phrase is used as expressing a reason for the rule. Such patient, who may be injured by the wrongful act of a hospital servant, is not a mere third party, a stranger to the transaction. He is rather a participant. The thing about which the servants are employed is the healing of the sick. This is set in motion, not for the benefit of the defendant, but of the public. Surely, those who accept the benefit, contributing also by their payments to the public enterprise, and not to the private pocket of the defendant, assist as truly as the defendant in setting the whole thing in motion. But the practical ground on which the rule is based is simply this: On the whole, substantial justice is best served by making a master responsible for the injuries caused by his servant acting in his service, when set to work by him to prosecute his private ends, with the expectation of deriving from that work private benefit. This has at times proved a hard rule, but it rests upon a public policy too firmly settled to be questioned. We are now asked to apply this rule, for the first time, to a class of masters distinct from all others, and who do not and cannot come within the reason of the rule. In other words, we are asked to extend the rule, and to declare a new public policy, and say: On the whole, substantial justice is best served by making the owners of a public charity, involving no private profit, responsible, not only for their own wrongful negligence, but also for the wrongful negligence of the servants they employ only for a public use and a public benefit. We think the law does not justify such an extension of the rule of *respondeat superior*. It is, perhaps, immaterial whether we say the public policy which supports the doctrine of *respondeat superior* does not justify such extension of the rule, or say that the public policy which encourages enterprises for charitable purposes requires an exemption from the operation of a rule based on legal fiction, and which, as applied to the owners of such enterprises, is clearly opposed to substantial justice. It is enough that a charitable corporation like the defendant, whatever may be the principle that controls its liability for corporate neglect in the performance of a corporate duty,

is not liable, on grounds of public policy, for injuries caused by personal wrongful neglect in the performance of his duty by a servant whom it has selected with due care; but in such case the servant is alone responsible for his own wrong. This result is justified by the opinions in *Hall* v. *Smith, Holliday* v. *St. Leonard's* [11 C. B. (N. S.) 192], and *Railway Co.* v. *Artist* [(C. C. A.) 60 Fed. 365, 23 L. R. A. 581], *supra,* substantially on the grounds above stated, and is reached, for one reason or another, by the greater number of courts that have dealt with this particular liability of a corporation for public or charitable purposes. . . . ''

While the exemption of charitable institutions from liability for the negligence of their servants might well be upheld on either of the two theories first above set forth, we think it is best supported by the principle so carefully and logically elucidated in the case last cited. The rule of *respondeat superior,* as is well shown, was originally founded solely on reasons of public policy. Such being the case, we think there are circumstances under which the application of that rule should, for the reasons of public policy also, be limited, and we are of the opinion that while it may do an injustice in individual cases, yet upon the whole it is for the best interests of the public to encourage the establishment and maintenance of charitable institutions by advising the donors thereto that their funds will not be diverted from their original purpose of charity to pay for the negligence of the employees of such an institution, provided always that the management thereof uses reasonable care in the selection of its employees.

We hold, therefore, that, under the law of Arizona, the application of the doctrine of *respondeat superior* to charitable institutions is limited, for reasons of public policy and so far as the beneficiaries of such institutions are concerned, to cases where the institution has not used due care in the selection of

the employees and agents who have actually been guilty of the acts of negligence which have caused damages to such beneficiary.

Does the fact that plaintiff in this case was a paying patient affect its liability? The general rule in the jurisdictions which uphold exemption from liability is that the fact it receives pay from some of its beneficiaries detracts nothing from its character as a charitable institution and does not change the rule in regard to its exemption from liability, both as to paying and nonpaying patients. *Nicholas* v. *Deaconess Home, supra; Duncan* v. *Nebraska Sanitarium & B. Assn.*, 92 Neb. 162, 137 N. W. 1120, Ann. Cas. 1913E 1127, 41 L. R. A. (N. S.) 973; *Greatrex* v. *Evangelical Deaconess Hospital, supra; Schloendorff* v. *Society of N. Y. Hospital,* 211 N. Y. 125, 105 N. E. 92, Ann. Cas. 1915C 581, 52 L. R. A. (N. S.) 505; *Adams* v. *University Hospital, supra; D'Amato* v. *Orange Memorial Hospital, supra; Gable* v. *Sisters of St. Francis, supra; Taylor* v. *Protestant Hospital Assn.*, 85 Ohio St. 90, 96 N. E. 1089, 39 L. R. A. (N. S.) 427; 11 C. J. 304.

We hold, therefore, that the beneficiaries of such an institution who may have contributed a greater or less sum for the benefits received are not in any different position than those who have received such benefits without any charge whatever. The test of the application of the rule is the general nature of the institution and whether it is maintained for the purpose of profit or for that of service, and not the extent or cost of the benefit which the beneficiary has received by availing himself of its privileges.

If, therefore, defendant was, within the meaning of the rule, a charitable institution, the trial court in the instruction above set forth necessarily committed reversible error. Was it such an institu-

tion? What constitutes a charitable institution has been considered frequently. The word "charity" has a well known and acknowledged meaning. It has been defined as a "gift to a general public use, which extends to the poor as well as to the rich." When charity is to be extended, not sporadically and to a few individuals, but to a large number over a long period of time, it is generally administered by some association, corporation or institution. The principal and distinctive features of institutions of this character are that they have no capital stock and no provisions for making dividends or profits, but derive their funds, to a considerable degree at least, from public and private charities, and above all, that they hold them in trust for the obligation of the institution, or, to put the matter in other language, the test of whether an institution is charitable is whether it exists to carry out a purpose recognized in law as charitable, or whether it is maintained for gain, profit, or private advantage. *McDonald* v. *Massachusetts General Hospital,* 120 Mass. 432, 21 Am. Rep. 529; *Hearns* v. *Waterbury Hospital, supra; Gitzhoffen* v. *Sisters of Holy Cross,* 32 Utah 46, 88 Pac. 691, 8 L. R. A. (N. S.) 161; *Union Pacific R. R. Co.* v. *Artist,* (C. C. A.) 60 Fed. 365, 23 L. R. A. 581. Generally speaking, the nature of the institution, if a corporation, and its purposes and objects are primarily determined by its charter or articles of association (*In re Loeb's Estate,* 167 App. Div. 588, 152 N. Y. Supp. 879; *Gitzhoffen* v. *Sisters of Holy Cross, supra*); and ordinarily extrinsic evidence is not admissible to establish that purpose. *Powers* v. *Massachusetts Hospital, supra; Union Pac. R. R. Co.* v. *Artist, supra.* When, however, it is contended that although the articles of incorporation show the institution to be a charitable one, it is not carrying out the purposes of those articles, parol evidence is admissible

to contradict the *prima facie* case made by the articles themselves. We hold, therefore, that the articles of incorporation of defendant are *prima facie* evidence of its character as a charitable institution, but that such evidence may be rebutted by a showing on behalf of plaintiff that it has not lived up to the principles set forth in such articles, for its responsibility is fixed, not by its intended purpose, but by what it was actually doing at the time of the alleged injury.

We fully appreciate that the rule laid down herein will work a hardship in some individual cases. This is particularly true of the case at bar. It is not disputed that a helpless infant has been seriously injured for life through negligence on the part of some attendant employed by defendant corporation, and the natural sympathy which all men have for the helpless caused us to seek earnestly for some method whereby relief could be granted him without thereby doing a greater injustice to the public in general through the statement of an erroneous rule of law. After a careful comparison and consideration of all of the cases cited by counsel, and after an analysis of the reasoning of the leading cases sustaining the different points of view, we are of the opinion that both upon sound reason and the overwhelming weight of authority the rules above stated by us as applying to the liability of charitable institutions in the state of Arizona for the negligence of their employees, are correct.

In conclusion, we wish to commend counsel for both plaintiff and defendant on the candid and courteous manner in which they have presented their arguments and the thoroughness with which those arguments have been prepared and briefed. It is a pleasure to any appellate court to consider cases so presented.

The judgment of the superior court of Pima county is reversed, and the case remanded for a new trial in accordance with the principles stated herein.

McALISTER and ROSS, JJ., concur.