230 P.2d 220

**RAY et ux. v. TUCSON MEDICAL CENTER.**

No. 5262.

Supreme Court of Arizona.

March 26, 1951.

James Elliott Dunseath, of Tucson, and Mark Wilmer, of Phoenix, for appellants.

Darnell, Robertson & Holesapple, of Tuscon, for appellee.

PHELPS, Justice.

This is an appeal from an order of the trial court directing a verdict in favor of defendant and the judgment entered thereon, and from an order denying plaintiff's motion for a new trial.

The parties will be hereinafter designated as plaintiffs and defendant.

The facts are that defendant is a corporate charitable institution engaged in the business of operating a general hospital in the city of Tucson. The plaintiff Essie Ray on January 24, 1948, entered the defendant's hospital for care and treatment of a torn sciatic nerve from which she was suffering. By February 29th she had almost completely recovered and on that date was being conveyed from her room for a physiotherapy treatment.

The physiotherapy department where these treatments were administered to plaintiff was located in a building forming a part of the defendant's hospital some distance from the building in which plaintiff's room was located. Plaintiff had been conveyed each day from her room to this building for such treatment by means of a regular hospital 4-wheel stretcher. The stretcher is described as a metal vehicle shaped like a narrow bed, approximately 4 feet high with 4 revolving wheels which we understand to mean that all 4 wheels operate on pivots. Arrangements had been made for plaintiff's discharge upon that date and she was on her way to the physiotherapy department to take her last treatment when the accident occurred resulting in the injury of which she complains.

There was employed at the hospital at that time a nurse's aide by the name of Ella Mae Leverette who was instructed on this particular day to convey plaintiff Essie Ray upon the stretcher to the physiotherapy department for her treatment. This was the first time she had been assigned to this task and consequently the first time plaintiff had seen her.

Leading from the door of the building in which plaintiff's room was located was a ramp down which the wheel stretcher had to pass on its way to the other building. The nurse's aide sought to procure aid to get the plaintiff down the ramp but being unable to get assistance, undertook the task alone. She lost control of the stretcher on the ramp. It rolled around several times and finally turned over, throwing plaintiff

upon the ground causing severe fright and shock. Plaintiff claims that soon thereafter she began to suffer and ever since has continued to suffer great pain in her upper back, shoulders and neck. It is claimed that the accident and injury occurred as a result of the negligent handling of the stretcher by Ella Mae Leverette and that defendant had failed to exercise due care in employing her as a nurse's aide.

Plaintiffs have presented three questions for our consideration:

1. Did the trial court err in instructing a verdict for defendant? In other words was the evidence of such character as to justify the court in instructing a verdict for defendant?

2. Is defendant as a charitable institution liable for the negligence of its employees?

3. Upon whom did the burden of proof rest to establish due care on the part of defendant in hiring and retaining Ella Mae Leverette of whose negligence plaintiff complains?

We are definitely of the opinion that the question of whether or not defendant exercised due care in the employment of Ella Mae Leverette as a nurse's aide should have been submitted to the jury. While it is true there is no conflict in the evidence as to what investigation defendant made before employing Ella Mae Leverette as a nurse's aide, we are of the view that the evidence, taken as a whole, is of such a character as to cause reasonable men to reach entirely different conclusions as to whether defendant did or did not exercise due care in employing her. Under such circumstances the case should have gone to the jury. Bowers v. J. D. Halstead Lumber Co., 28 Ariz. 122, 236 P. 124. Negligence only becomes a question of law for the court's determination when rational minds may not draw different conclusions from the undisputed evidence. Tom Reed Gold Mines Co. v. Morrison, 26 Ariz. 281, 224 P. 822. Therefore in withdrawing the question of negligence from the jury the court committed reversible error. For this reason alone the judgment of the trial court must be reversed and remanded for a new trial.

Counsel for appellant however urges us to reconsider the question of the liability of charitable institutions for torts committed by their employees. This court declared it to be the law in this state in the two cases of Southern Methodist Hospital and Sanatorium v. Wilson reported in 45 Ariz. 507, 46 P.2d 118 and in Id., 51 Ariz. 424, 77 P.2d 458, that charitable institutions were not liable for the torts of a servant where due care had been exercised in her selection. These decisions were bottomed upon the ground of public policy.

Realizing that public policy is, in its very nature, always fluctuating, varying with customs growing out of changing social, political and economic conditions and recognizing the radical changes that have

taken place in each of these fields of activity during the past two decades, we believe it not only proper but necessary that we reconsider the rule laid down in those cases.

Except in those jurisdictions where the trust fund theory was originally adopted, and before so many exceptions were incorporated into it, a study of the decisions of the various courts of the United States upon the subject strongly suggest the conclusion that the wishes of the individual members of the courts, rather than logical reasoning, have fathered the concept that corporate charitable institutions occupy a legal status so different from that of other corporate entities that they should be immune from liability for the torts of their servants. In an effort to distinguish them from other corporations the courts have resorted to subtle refinements and sophistry. They have invoked legal fictions and engrafted restrictions upon principles of law so well established and so fundamentally just that their soundness can no longer be questioned. The confused results of these decisions reached by reasons more confusing, lead us to exclaim with Pascal "How ludicrous is reason, blown with a breath in every direction!" For a collation of cases reflecting the various views of the courts see section 402, pages 102 to 108 inclusive of the 1951 supplement, Volume 3 of Scott on Trusts. Once having established the rule most courts have been reluctant to reconsider the principle involved and over-rule their previous decisions.

In the case of President and Directors of Georgetown College v. Hughes, 76 U.S. App.D.C. 123, 130 F.2d 810, 812, decided in 1942, in which a Federal court appears to have made a most exhaustive study of the subject Justice Rutledge in appraising the results of the decisions of the courts said: "Paradoxes of principle, fictional assumptions of fact and consequence, and confused results characterize judicial disposition of these claims. From full immunity, through varied but inconsistent qualifications to general responsibility is the gamut of decision. The cases are almost riotous with dissent. Reasons are even more varied than results. These are earmarks of law in flux. They indicate something wrong at the beginning or that something has become wrong since then. They also show that correction, though in process, is incomplete."

There are four reasons assigned by the different courts for denying liability of corporate charitable institutions for the torts of their employees:

1. The "trust fund" theory, i. e., that the funds and property of these institutions are held in trust and cannot be diverted to purposes other than that designated in the trust.

2. That the doctrine of *respondeat superior* cannot be extended so as to apply to charitable institutions because such institutions are not operated for profit.

3. The "implied waiver" theory, i. e., that when one enters a hospital for treatment, he by accepting the services rendered him, waives all right to claim damages for injuries suffered as a result of the negligence of the hospital or its employees. In other words he assumes the risk of negligence.

4. "Public policy," i. e., that to allow recovery would be against public policy.

When boiled down to its final analysis the rule of nonliability of these institutions as declared by all of the courts so holding, has been based upon the ground of "public policy", assigning as reasons therefor either (1) because it wrongfully diverts trust funds from the purposes for which the trust was created and if permitted would stifle charity by discouraging donations for charitable purposes by those who are charitably inclined or that (2) it wrongfully extends the doctrine of *respondeat superior* to embrace corporations engaged in business not operated for profit; or (3) that by accepting the treatment received the patient assumes the risk of negligence and impliedly agrees to waive liability on the part of the institution for torts committed by it or its employees. While the latter is based upon the theory of an implied contract, it is upon the ground of public policy that the implied contract is claimed to arise. In the decisions based upon the implied waiver theory the Good Samaritan, first introduced into the law of these cases in Powers v. Massachusetts Homoeopathic Hospital, 1 Cir., 109 F. 294, is brought to the rostrum by the courts and made to protest against a rule of law that would hold him liable in damages for the torts of his servant while he is engaged in a charitable enterprise. Yet that is exactly what the law has always done in such cases except where the Good Samaritan happens to have been a corporate charitable institution or conducting the business of charity under a trust created for that purpose. The assumption by the court that the Good Samaritan was not liable while doing an act of charity was based upon sentiment, not law. Charity has never been a defense to such actions.

Regardless of the theory adapted upon which the rule of nonliability for these institutions rests, few courts have applied any one of the theories with consistency. It is therefore impossible to discover any common thread of logic in the decided cases which can be depended upon to lead us out of the existing confusion. Justice Rutledge in the Georgetown College case, supra, further analyzing the result of these decisions, said:

"It is doubtful that the so-called 'rule' of full immunity ever represented the prevailing state of decision in this country. * * * Nevertheless judicial discussion has set in the pattern that immunity is the rule, much of it without explicit recognition that the 'rule' itself is an exception to general principles of liability.

"Notwithstanding the pattern, the 'rule' has not held in the tests of time and deci-

sion. Judged by results, it has been devoured in 'exceptions.' Debate has gone on constantly, not so much as to whether, but concerning how far it should be 'modified,' with ever widening modification.

"It is perhaps impossible, if it were worth while, to make an exact summary of the present state of American decision or to determine with accuracy what is the 'prevailing rule.' An effort to do this made later discloses a tangled skein from which it is difficult to draw a thread of dominant strength, even on a numerical basis. This much, however, is sure. The immunity, so far as it ever existed, has disappeared largely as to all persons and classes of claimants save one. This includes only so-called beneficiaries of the trust or charity. That class now is disintegrating, and the rights of the beneficiary, who needs the protection most, also are securing recognition. If we look at results, therefore, rather than words or forms of statement in opinions, for the test of what is 'the law' or 'the prevailing rule,' immunity is not 'the rule' and liability 'the exception.' The rule has become merely a relict in the multitude of departures.

"Notwithstanding this, the habit of statement remains long after results have contradicted it. Opinions continue to speak in the set pattern, often when holding only to the last remnant of irresponsibility and occasionally, as is noted later, when repudiating all grounds for retaining that. The judicial debate continues around the 'modifications' which should be made. Nearly everywhere the question is, not whether the immunity is total, but whether (1) the plaintiff is one entitled to hold the corporation to payment; or (2) whether it should be charged for the act of a particular agent, servant, employee or other representative. Liability also turns here and there, apparently, on where the act occurs or its nature, such as driving an ambulance or a truck on the streets in contrast to running an elevator or pushing a cart in the corridors of the hospital. In some jurisdictions, strangers (that is, persons not beneficiaries of the charity) may recover; in others, paying beneficiaries also, but not nonpaying, may do so. In both there is much debate as to who is stranger and who is beneficiary. * * *

"Similarly, some states impose liability for the negligence of managing officials, but not for that of less authoritative employees or agents. Others apply, in this respect, substantially the rule applied generally to business corporations, namely, without attempting to state it precisely, that the corporation will be liable for all negligence inflicted by employees or other representatives whose function it is or reasonably appears to be to perform the act, in the course of doing which the negligence and the injury occur. * * *

"From this welter of conflict, the following general, but none too sure conclusions may be made. Five states appear to have no decisions on the subject. Eleven apparently adhere to full immunity, with ex-

ceptional liabilities which have been noted. Three certainly, and apparently a fourth, have imposed unqualified liability. New York has done so after tortuous efforts to find a satisfactory intermediate stopping place. England, Canada, and New Zealand have adhered to this position since Mersey Docks Trustees v. Gibbs, supra. In seven states strangers and paying beneficiaries may recover, but the question has been reserved as to nonpaying ones, with strong indications in some instances that they too will be accorded protection. Colorado and Tennessee impose liability if the charity is protected by insurance, and the latter, with Georgia and some other states, applies it to the extent of property owned by the corporation and used not directly in carrying on the charitable enterprise, but for business purposes to produce income for its support. The trend in the ten states last referred to seems clearly toward unqualified responsibility. When its weight is added to that of the jurisdictions which impose full liability, the apparent preponderance of authority supporting immunity disappears.

"In thirteen of the remaining states, apparently, strangers are allowed to recover, but beneficiaries are denied relief. This constitutes, numerically, perhaps the slightly largest group. But in such a kaleidoscope of result and reasoning it hardly can be said there is a preponderant 'weight of authority.' The plurality, if any, is highly unstable, and this is accentuated by the conflict, already noted, concerning who is beneficiary, who stranger."

Since the above decision was handed down in 1942, some of the state courts have receded from their former positions of nonliability of these institutions for the torts of their servants. In the case of Haynes v. Presbyterian Hospital Ass'n, Iowa, 45 N.W.2d 151, 154, the Iowa Supreme Court expressly overruled two former decisions in which it had held charitable institutions immune from liability for such torts. In the above case the court criticizes the trust fund theory, the nonapplicability of the *respondeat superior* maxim and the implied waiver theory, stating that these doctrines which have been advocated in support of the immunity of charitable institutions have little of inherent or real merit to recommend them. It further says in substance that the public policy theory while it may at the outset have been sound, under changing conditions the reason for its further existence no longer obtains. The court concludes by saying: "It is our considered judgment that incorporated charities should respond as do private individuals, business corporations, and others, when it does good in the wrong way. This pronouncement being, as it is, contrary to the rule announced in the Mikota and Servison cases, supra, they must be and are hereby overruled. * * *"

If the rule imposing liability upon charitable institutions in favor of strangers and paying patients is predicated upon the trust

fund theory, the denial of recovery to a charity patient for whose benefit the trust was primarily created is so inconsistent with that theory that it will not bear the searchlight of reason. It is a complete answer to say that it constitutes a diversion of trust funds to satisfy the judgment of a stranger or a paying patient for injuries sustained to the same extent as it does to satisfy the judgment of a nonpaying patient.

If based upon the theory that the doctrine of *respondeat superior* does not apply because the defendant is a nonprofit institution, then it can make no difference whatever whether the patient pays or does not pay or whether the claimant is or is not a stranger. Its character as a nonprofit organization is not changed or affected by the fact that an injured patient pays or does not pay for the care he receives nor by the fact that the injured person is a stranger. It reduces itself to an absurdity to say that the doctrine does apply to strangers and paying patients but does not apply to nonpaying patients. This doctrine is a development of the common law and as applied by the courts of England has never been limited to cases where the master was engaged in business for profit. It was said in Mersey Docks v. Gibbs, L.R. 1 H.L. 93 (11 H.L. 686): "Upon the principle that qui facit per alium per se, the master is responsible for the acts of his servant; and that person is undoubtedly liable who stood in relation of master to the wrongdoer, he who had selected him as his servant from the knowledge or belief in his skill and care, and who could remove him for misconduct, and whose orders he was bound to receive and obey." And in Gilbert v. Trinity House, 17 Ca.Q.B.D. 795, the court said: "The law is plain that whosoever undertakes the performance of, or is bound to perform, duties—whether they are duties imposed by reason of the possession of property, or by the assumption of an office, or however they may arise—is liable for injuries caused by his negligent discharge of those duties. *It matters not whether he makes money or a profit by means of discharging the duties, or whether it be a corporation or an individual who has undertaken to discharge them.* It is also immaterial whether the person is guilty of negligence by himself or by his servant, if he elects to perform the duties of his servant. If in the nature of things he is obligated to perform the duties by employing servants, he is responsible for their acts in the same way that he is responsible for his own." (Emphasis supplied.)

The courts of the United States who rejected the trust fund theory and the implied waiver theory, being hard put to exempt charitable institutions from liability for the torts of their servants, engrafted on to the English rule of *respondeat superior* the condition that the master must be engaged in a business for profit before the doctrine is applicable. The declaration of these courts that the *doctrine cannot be extended* to ap-

ply to charitable institutions is a misstatement of fact. The doctrine requires no extension for this purpose. Refusing to permit it to apply in such cases is not an extension of the doctrine but is clearly a restriction upon the common law concept of the doctrine by engrafting onto it a condition which is not and never has been the common law rule.

If the holding that such institutions are liable to strangers and paying patients and not liable to nonpaying patients is grounded upon the theory of "implied waiver", it might be argued by superficial reasoning that the implied waiver agreement was supported by a valuable consideration as between the hospital and the nonpaying patient. The consideration for the waiver may be said to be the acceptance of treatment from the institution without charge while in the case of a stranger or paying patient there would be no consideration to support a waiver. The theory of implied waiver however is so thoroughly illogical that it is difficult to understand how it has gained the approval of any court. It not only denies the very individuals for whom the charity was intended, the benefit of the charity but it makes it compulsory upon him, if injured by the negligence of an employee, to donate to charity the amount he would otherwise be entitled to recover for his injuries. This saving to the institution may in turn be used by it to satisfy the judgment of a stranger for injuries which he may have sustained as a result of the same act of negligence.

This theory has been severely criticized by many courts. For example in the case of Gamble v. Vanderbilt University, 138 Tenn. 616, 200 S.W. 510, 512, L.R.A.1918C, 875, the court said: " * * * There are cases from time to time occurring, and not altogether infrequent, to which it is, as it seems to us, impossible to apply it—patients conveyed to hospitals in a demented condition, persons temporarily unconscious from injuries and who require immediate surgical and other attention, those who are so debilitated by disease as to have no power of understanding the terms of a contract, children too young to understand the meaning of a contract, or to make or be bound by one in any form, or even to understand the nature of the work to be done for them. How can such persons be held to waive a right of action which the law gives them? How can they be held to have agreed to an exemption? Manifestly the only sound theory is that of an exemption based on public policy. * * *" In the 1921 Mich.L.Rev., Vol. 19, pp. 395 to 412, Carl Zollman in an article on Damage Liability of Charitable Institutions said: "The objection to this theory is that it does violence to the facts, 'A patient entirely unskilled in legal principles, his body racked with pain, his mind distorted with fever, is held to know, by intuition, the principle of law that the courts after years of travail have at last produced.' "

It was said in the case of Hoke v. Glenn, 167 N.C. 594, 83 S.E. 807, 809, that: "The beneficiaries of charitable institutions are the poor, who have very little opportunity for selection, and it is the purpose of the founders to give to them skillful and humane treatment. If they are permitted to employ those who are incompetent and unskilled, funds bestowed for beneficence are diverted from their true purpose, and, under the form of a charity, they become a menace to those for whose benefit they are established."

This court has had occasion to define a waiver in several decisions. In Guarantee Title & Trust Co. v. Babbitt Bros. Trading Co., 47 Ariz. 47, 53 P.2d 734, 736, we defined a waiver as: " * * * a voluntary and intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right * * * 'waiver must be intentional and upon a consideration, or the act relied on must be such as to constitute an estoppel.' * * * " See also Waugh v. Lennard, 69 Ariz. 214, 211 P.2d 806. Under this definition of a waiver certainly patients who may be unconscious or demented at the time of entry or infants may not be held to the theory of "implied waiver".

The great majority of the courts which hold that a charitable institution is not liable for the negligence of its employees hold it liable for negligence in selecting such employees. This court aligned itself with that group in the Wilson cases, supra, yet as pointed out above there can be no sound reason given for such distinction upon either of the theories assigned for the rule. Nor is it logical upon any of the theories employed by the courts to distinguish between negligence of the manager of the corporation and the negligence of a nurse, or a janitor, as a basis for allowing or denying recovery. A corporation can only act through its employees and the fact that the injury is due to the negligence of one who is charged with the management of the institution does not change the fact that he too is an employee. The distinction is based solely upon a legal fiction. It is a distinction without a difference. If the doctrine of *respondeat superior* does not apply to charitable institutions that ends it. No refinements of logic can make it apply so that liability can attach for tort in any case.

When the Wilson case, supra, was first presented to this court, the question of nonliability of corporate charitable institutions was one of first impression in this jurisdiction, and after a discussion of the decisions of a number of courts on the subject, the court concluded that the case of Hearns v. Waterbury Hospital, 66 Conn. 98, 33 A. 595, 602, 31 L.R.A. 224, offered the best reasoning for its views of any of the cases considered. It followed the rule laid down in that case and quoted at length therefrom: A study of the decision of the Connecticut court indicates that its reason for holding that the imposition of liability upon such institutions for their torts "would

be carrying the doctrine of respondeat superior to an unreasonable and dangerous length." The court then continued by saying: "That doctrine is at best, as I once before observed, a hard rule." It then engrafted onto the doctrine the rule that it did not apply because " * * * It derives no benefit from what its servant does, in the sense of that personal and private gain which was the real reason for the rule. * * * " As pointed out above, gain or profit has no reasonable relation to the doctrine of *respondeat superior*. It rests upon the employment of the servant by the master and the master's right to exercise direction and control over his work in the conduct of his business.

Following the reasoning in the Hearns case, supra, the court said: "We hold, therefore, that, under the law of Arizona, the application of the doctrine of *respondeat superior* to charitable institutions is limited, for reasons of public policy and so far as the beneficiaries of such institutions are concerned, to cases where the institution has not used due care in the selection of the employees and agents who have actually been guilty of the acts of negligence which have caused damages to such beneficiary. * * * " [45 Ariz. 507, 46 P.2d 125.] (Emphasis supplied.)

It will be observed from the above quotation that this court fell into the error of inconsistency by saying in effect that (1) if due care is exercised in the selection of an employee who has actually been guilty of negligence causing damage to the so-called beneficiary, the doctrine of *respondeat superior* does not apply and no liability attaches as a result of the wrongful injury; (2) if due care has not been exercised in the selection of the employee whose negligence causes damage to such beneficiary the doctrine of *respondeat superior* does apply and liability attaches for such act.

The court expressly limited the application of the doctrine or rule to so-called beneficiaries. It thereby left the door open to add another inconsistency to it by following the lead of nearly all of the courts in holding that a stranger may recover for the torts of an employee of the institution. Notwithstanding this fact the court said later in the opinion: " * * * The test of the application of the rule (meaning respondeat superior) is the general nature of the institution and whether it is maintained for the purpose of profit or for that of service, * * * ."

The question of whether the doctrine of *respondeat superior* applies in any given case depends upon whether the relation of master and servant exists at the time the tort was committed, not upon the relation of the injured person to the master. This being true, if a stranger may invoke the doctrine of *respondeat superior* it irresistibly follows that a so-called beneficiary, whether he be a paying or nonpaying patient, may likewise invoke it.

34

It is pointed out by Justice Rutledge in the Georgetown College case, supra, that scholarly treatments outside the court are almost uniform to the effect that full liability should attach to such institutions in these cases. Lester W. Feezer, now a professor of the law department of the University of Arizona in an able discussion of this subject in an article appearing in Vol. 77, U. of Pa.L.Rev. 191 (1928) in taking the position that charities whether they be corporations, trusts or other form of legal entity should be liable to the same extent as other employers to pay damages for torts committed through the negligence of their employees, asked the question:

"* * * Is it more just today that a patient, an inmate, or any other beneficiary of a charitable institution, whether supported by the endowment of one wealthy philanthropist or by the gifts of many persons, should be allowed to recover damages against the intending benefactor, or that the loss or suffering to the individual should rest where it falls? * * *

"Here then is a question of justice between the two parties most directly affected. But the claims of both upon the favor of justice are subject to the rights and welfare of society, and also subservient to the interests of that government in whose name and by whose machinery justice must be determined and administered. What does this mean, but that the question must be settled by reference to social policy and in no other way? The law has its rules and its principles of legal policy, and will answer the questions put to it in terms of the policy of the law. Now what makes the policy of the law what it happens to be, in this or any other case, rather than just the contrary? Legal policy is but a reflection of a detail from the total ensemble of social policy. However, the law does not reflect social policy instantaneously as a mirror reflects the image of an object placed before it. Only after the waves or emanations from a particular manifestation of social conduct have shown upon the film of the law for some time does it absorb enough of the rays to produce a visible image. In other words, there must be a time exposure before the image of changed social phenomena and correspondingly changed social requirements become fixed in the law, just as is required by a photographic film which is exposed in a dimly lighted place. It would therefore seem that when society is sure enough of what it wants, and when that certainty has persisted for a sufficiently long time, the thing will ultimately come to pass.

"Why is it just, at the present day, to hold charities liable in the type of situation here under discussion? It is submitted that the imposition of liability in such cases is justice now, even if it were not always so. This is so now because it has at this point in our social progress become evident that social policy, to be consistent with its development as a whole, must be interpreted as calling for the imposition of liability in

such cases. The charity of times gone by, to the extent that it then existed, was a very different thing from the modern charity. Charity has become organized. Formerly, except as it was a part and creature of the Church, it was not organized at all, and depended upon the humane instincts of individuals or small informal groups. Some of the decisions, evidently influenced in part at least by this conception, have said that the Good Samaritan must not be discouraged by being mulcted in damages; yet as a private individual he would be held liable. The volunteer who does a job negligently is everywhere held liable."

Prosser on Torts, published in 1941, p. 1084, in pointing out that the extent of the immunity covered varies according to the particular justification adopted, concludes that only a few courts adhere to the English rule " *   *   * which seems to be the only really logical or desirable one, that even as to recipients the charity is as fully liable for the torts of its employees as any private corporation." To the same effect is Scott on Trusts, Vol. 3, p. 2150, Sec. 402, which reads as follows: "If this principle (disallowing a recovery out of trust funds) is accepted, a charitable institution is under no liability either to a recipient of benefits, or to an employee or to a stranger; and it is immaterial whether the injury was due to the fault of an employee or to the fault of the trustees or other managers of the institution. The injured person has no remedy except against the individual whose fault caused the injury. Such a sweeping exemption from liability of charitable institutions seems to be clearly against public policy. The institution should be just before it is generous." Discussions of this subject supporting the same view are found in 1936 publication of American Bar Ass'n J. Vol. 22, p. 48; 34 Yale L.J. 316 (1925); 14 Boston U.L.Rev. 477 (1934); 22 Va.L.Rev. 58 (1935); 48 Yale L.J. 81 (1938). Some of them point out that liability insurance is now available to these institutions and that it may be reasonably contemplated by trustors creating charitable trusts that the expense of carrying such insurance would as necessarily be involved in the operation of its business as any other legitimate expense.

The writers of these articles occupy a position with respect to the advancement of the judicial body of the law similar to that of the corps of engineers to an advancing army. Unfettered by precedent and *stare decisis* these gentlemen are always in the vanguard of the progressive march of the body of the law, constructing bridges, as it were, and clearing the way for advanced positions which may be safely contained when surrounded by new and changing social, political and economic conditions. They are quick to recognize the development of a social policy and are instrumental in crystallizing it into a fixed concept which the legislature and the courts denominate "public policy."

■■ The declaration of "public policy" is primarily a legislative function. The

courts unquestionably have authority to declare a public policy which already exists and to base its decisions upon that ground. But in the absence of a legislative declaration of what that public policy is, before courts are justified in declaring its existence such public policy should be so thoroughly established as a state of public mind, so united and so definite and fixed that its existence is not subject to any substantial doubt. Sheehan v. North Country Community Hospital, 273 N.Y. 163, 7 N.E.2d 28, 29, 109 A.L.R. 1197. It is equally true that when the reason for the existence of a declared public policy no longer obtains that the courts should without hesitation declare that such public policy no longer exists.

During the past two decades both the Federal Congress and the legislatures of pratically all of the states have in various forms declared a public policy to exist in this country that is diametrically opposed to that invoked in these cases to sustain the immunity of charitable institutions from liability for damages for the torts of their servants. As examples practically every state in the Union has enacted a workmen's compensation law; occupational disease disability laws making employers liable to workmen if the injury or illness arises out of and in the course of their employment regardless of any question of negligence; employment security acts designed to take care of individuals during periods of enforced idleness, and even in cases of voluntary strikes under certain circumstances thus relieving the unfortunates of the burdens of misfortune and shifting such burdens to the shoulders of the public at large. In addition to these laws Federal legislation has encompassed the entire field of welfare and social security.

We believe that these legislative declarations of public policy which relieves the individual from the burden of his misfortunes and makes the general public bear the load levying taxes directly or indirectly to carry out such policy, completely repudiate the rule of nonliability of charitable institutions for the torts of their servants based on public policy.

For the above reasons we are of the opinion that if public policy ever required that charitable institutions should be immune from liability for the torts of their servants, that public policy no longer exists. We therefore expressly overrule the holding in the Wilson cases, supra, and now hold that charitable institutions are liable for the torts of their servants from which injury proximately results to a third person, whether stranger or patient and whether the patient is a paying or nonpaying patient. In this view of the case the question of the burden of proof becomes immaterial.

Judgment reversed and remanded for a new trial in accordance with the views hereinabove expressed.

UDALL, C. J., and STANFORD, DE CONCINI and LA PRADE, JJ., concur.