[Civil No. 3910. Filed March 21, 1938.]

[77 Pac. (2d) 458.]

SOUTHERN METHODIST HOSPITAL AND SAN-ATORIUM OF TUCSON, a Corporation, Appellant, v. MAX EUGENE WILSON, a Minor, by His Guardian ad Litem, BERYL E. WILSON, Appellee.

Mr. Samuel L. Pattee, for Appellant.

Mr. Frederick G. Nave and Mr. Henry R. Merchant, Jr., for Appellee.

LOCKWOOD, J.—This is the second time this case has been before the court. *Southern Methodist Hospital and Sanatorium* v. *Wilson,* 45 Ariz. 507, 46 Pac. (2d) 118. The facts which gave rise to the action are stated fully in the previous opinion, and no further statement is made except as it may be necessary in regard to new matters appearing at the second trial. On the previous appeal the only questions which were considered by this court were whether or not charitable institutions were subject to the rule of *respondeat superior,* and what evidence it took to establish the character of such an institution. Our holding on these two points was as follows:

"We hold, therefore, that, under the law of Arizona, the application of the doctrine of *respondeat superior* to charitable institutions is limited, for reasons of public policy and so far as the beneficiaries of such institutions are concerned, to cases where the institution has not used due care in the selection of the employees and agents who have actually been guilty of the acts of negligence which have caused damages to such beneficiary.

" . . . What constitutes a charitable institution has been considered frequently. The word 'charity' has a well known and acknowledged meaning. It has been defined as a 'gift to a general public use, which extends to the poor as well as to the rich.' When charity is to be extended, not sporadically and to a few individ-

uals, but to a large number over a long period of time, it is generally administered by some association, corporation or institution. The principal and distinctive features of institutions of this character are that they have no capital stock and no provisions for making dividends or profits, but derive their funds, to a considerable degree at least, from public and private charities, and above all, that they hold them in trust for the obligation of the institution, or, to put the matter in other language, the test of whether an institution is charitable is whether it exists to carry out a purpose recognized in law as charitable, or whether it is maintained for gain, profit, or private advantage. (Citing cases.) Generally speaking, the nature of the institution, if a corporation, and its purposes and objects are primarily determined by its charter or articles of association (citing cases); and ordinarily extrinsic evidence is not admissible to establish that purpose. (Citing cases.) When, however, it is contended that although the articles of incorporation show the institution to be a charitable one, it is not carrying out the purposes of those articles, parol evidence is admissible to contradict the *prima facie* case made by the articles themselves. We hold, therefore, that the articles of incorporation of defendant are *prima facie* evidence of its character as a charitable institution, but that such evidence may be rebutted by a showing on behalf of plaintiff that it has not lived up to the principles set forth in such articles, for its responsibility is fixed, not by its intended purpose, but by what it was actually doing at the time of the alleged injury.''

And we reversed the case for a new trial to determine whether or not, as a matter of fact, the defendant was living up to the principles set forth in its articles of incorporation. The record shows the following situation on that point. In the year 1926 there was existing in the city of Tucson a general hospital and sanatorium, owned and operated by the Tucson Hospital Association. It owned certain property suitable for such purpose, which was encumbered by various mortgages and debts, amounting then to approxi-

mately $52,000. The burden of carrying on this hospital was more than those who owned it cared to continue, and when the general conference of the Methodist Episcopal Church, South, which is a religious society, met in Memphis in May, 1926, an offer was made to deed the property to it. The matter was investigated, and the church determined that it would acquire such property in trust for hospital purposes, and designated certain persons to take over for the church the property above referred to. It was thought advisable that the institution should be incorporated as a religious and charitable corporation, without pecuniary profit as its object, under the laws of the state of Arizona, and on the 12th day of January, 1927, this was done and the property transferred to the new corporation. It appears clearly from the articles of incorporation that the purpose of the corporation was to operate a benevolent and charitable institution in Tucson for the care of the sick, and that there were to be no profits or benefits for any person or organization resulting from the operation of the institution. The corporation took over the hospital and operated it from the early part of 1927 until the present time. There is, and can be, no question that the original intention and purpose of the incorporators of defendant was to establish a charitable hospital in the city of Tucson, and to operate it as such. Nor is this disputed by plaintiff, his contention being that the institution, in its operation, departed widely from its original purpose. He bases this on the fact, as shown by the records of the hospital, that the vast majority of the patients who were treated by it during its existence paid a greater or lesser sum for the services rendered them, and that there was very little free medical or hospital attendance given to anyone. The records show clearly that this is substantially true. Generally speaking, the operating costs of the hospital approxi-

mated eighty to a hundred thousand dollars per year. Of its total revenues, approximately 90 per cent. was from fees received from its patients, and the other 10 per cent. by contributions from various charitable organizations and institutions. Had the defendant, at the time of its organization, owned the hospital property, fully equipped and free from debt, it is probable that, over the period of its organization, as a whole its operating revenue would have slightly exceeded its total expenses. It was not, however, in this fortunate condition. The property which it took over was heavily burdened with debt, and while there were various contributions made from time to time, amounting to forty or fifty thousand dollars in all, which went into its capital and assets, defendant was forced to assume the existing indebtedness, together with other necessary expenditures for improvement and maintenance, the bonded indebtedness reaching at one time $75,000, and the floating indebtedness varying in amount, sometimes running as high as twenty or twenty-five thousand dollars additional. When the carrying charges of the indebtedness are added to the operating expenses of the institution, it appears that it was able.to pay little, if anything, on the reduction of the principal of the indebtedness at any time, and in its later years was unable to pay even the carrying charges of the debt in full, so that it never made a true profit, in the sense that profit is reckoned by a private corporation, during the course of its existence. No dividends of course were ever paid, and most of the officers and directors, aside from those engaged continuously in the operation of the physical plant, gave their services free at all times.

The question then is, whether an institution with the purpose we have described above, operated in the manner in which we have pointed out, is, within the meaning of the law, a charitable institution. The

word "charity" has many definitions, the one most commonly thought of by the ordinary person being defined by Webster as "whatever is bestowed gratuitously on the needy or suffering for their relief," and its synonym is "alms." It is also, however, defined as "an institution founded by a gift and intended for the use of the public as a hospital, a library, a school, a museum, etc." The idea which is back of all of the definitions of charity, we think, may well be described as "an act or feeling of benevolence." It is based primarily upon the motive behind the act which is that of benefit to another, without private profit to the donor. When charity is not to consist of a few sporadic acts for a small number of individuals, but is to be extended to the public in general through a long period of time, it is generally handled by some institution which is able to collect the small gifts of the many, whether in money or service, and dispense them where they will do the greatest good, just as a reservoir collects the water from a thousand springs and passes it out in a regulated manner to its beneficiaries. Were all the funds of an institution which was established for a charitable purpose contributed by those who receive no direct benefit from the institution, without any expectation of return, and were the services of the institution given absolutely free of any charge whatever, it would be recognized by all that the institution was, in the strictest interpretation of the word, a charitable one. But if we are to limit the application of the phrase "charitable institution" to those of this nature, the list would be small, indeed, and if those who gave of their time and money, without hope of personal return therefrom, to keep the many hospitals of this country open were to be told that their contribution must be sufficient to support the institution entirely, without any payment whatever by anyone for the services which it

rendered, we are certain that a vast majority of those hospitals would be closed tomorrow. There are few of them, indeed, that are able to dispense unlimited hospitalization free of charge. Only the nursing sisters of religious organizations, as a rule, will give their personal services indefinitely without remuneration, and even they must be fed and clothed. There are few communities where the food necessary for the inmates of such an institution, the fuel to warm them, the medicine to cure their ills, will be given in their entirety free of charge. The amount of endowment sufficient to provide funds for this purpose would be great. Even an institution as small as that of defendant would need a debt free plant and an invested fund of nearly two million dollars to continue its existence on the present scale. If, therefore, we are to insist that those who contribute with the idea that the institution which receives their funds is a charitable one, must make that contribution large enough to maintain the institution not only a charitable, but as a free one, in many, if not most, of our communities there will be no place where the sick may be cared for under any circumstances, except the private nursing homes available only to the very wealthy, or the county hospitals for indigents. We think the position that the test of a charitable institution is the extent of the free services rendered, is difficult of application and unsound in theory. Is there a definite test which can be given? If the purpose of the institution is one which is recognized in law as charitable, and if it is not maintained for the private gain, profit, or advantage of its organizers, officers, or owners, directly or indirectly, we think the institution is properly characterized as a charitable one, notwithstanding the fact that it charges for most, if not all, of the services which it may render, so long as its receipts are devoted to the necessary maintenance of the institution and the

carrying out of the purpose for which it was organized. In the case of *McDonald* v. *Massachusetts General Hospital*, 120 Mass. 432, 21 Am. Rep. 529, the court said:

"The corporation has no capital stock, no provision for making dividends or profits, and whatever it may receive from any source it holds in trust to be devoted to the object of sustaining the hospital and increasing its benefit to the public, by extending or improving its accommodations and diminishing its expenses. Its funds are derived mainly from public and private charity; its affairs are conducted for a great public purpose, that of administering to the comfort of the sick, *without any expectation, on the part of those immediately interested in the corporation, of receiving any compensation which will inure to their own benefit, and without any right to receive such compensation*. This establishes its character as a public charity. *Jackson* v. *Phillips*, 14 Allen 539. The fact that its funds are supplemented by such amounts as it may receive from those who are able to pay wholly or entirely for the accommodation they receive does not render it the less a public charity. All sums thus obtained are held upon the same trust as those which are the gifts of pure benevolence. *Gooch* v. *Association for Relief of Aged Indigent Females*, 109 Mass. 558." (Italics ours).

We think the vital point of this statement is the italicized portion of the quotation and, if this be the correct definition of a charitable institution, certainly the Southern Methodist Hospital comes within its terms. Counsel for plaintiff has cited to us *Hamilton* v. *Corvallis Gen. Hospital Assn.*, 146 Or. 168, 30 Pac. (2d) 9, 15, as being the nearest in point of fact to the present case. We think a careful reading of the case cited shows that the situation was very different from that of this one. The court therein said:

"Although the record does not indicate definitely the financial condition of the former corporation at the time its assets were transferred to the defendant corporation, it can easily be inferred therefrom that

its business was a losing enterprise. The evidence, however, is explicit to the effect that the succeeding corporation was organized for the purpose, among other things, of escaping the payment of taxes. There is also evidence to the effect that the prior corporation was doing a great amount of charitable work.

"We are of the opinion that the trial court did not err in submitting to the jury the question of whether the defendant corporation was a strictly charitable institution or was being operated for profit in the interest and for the benefit of the stockholders of the prior corporation, after those stockholders had become the owners and holders of approximately $50,000 worth of defendant's second mortgage bonds. . . .

"Apparently the stockholders of the predecessor corporation, in the case at bar in making the transfer to the new corporation dealt with some of the stockholders of the former corporation who had become the founders and trustees of the succeeding organization. From the evidence it might be inferred that one of the principal purposes in forming the new corporation was, through the elimination of taxes and other expenses, to enable the stockholders of the former corporation to be repaid the par value of their stock. By this arrangement such stockholders became preferred creditors, whereas under the original plan their rights had been subordinate to those of all creditors," and recognized the true test in the following language:

" 'In other words, the test of whether an enterprise is charitable is whether it exists to carry out a purpose recognized in law as charitable, or whether it is maintained for gain, profit, or private advantage.' 11 C. J. 303. 'However, if the hospital is conducted for profit, although receiving free of charge patients unable to pay, it is not a charitable institution.' 30 C. J. 462."

The test is not whether the patients of the hospital pay more or less for their services, but whether those charged with its operation were conducting it for their private profit or advantage. We have examined the other cases cited by counsel for plaintiff, such as *Baker* v. *Board of Trustees,* 133 Cal. App. 243,

23 Pac. (2d) 1071, *Sessions* v. *Thomas Dee Memorial Hospital,* 89 Utah 222, 51 Pac. (2d) 229, *England* v. *Hospital of Good Samaritan,* 16 Cal. App. (2d) 640, 61 Pac. (2d) 48, *Waller* v. *Lane County,* 155 Or. 160, 63 Pac. (2d) 214, and *England* v. *Hospital of Good Samaritan,* 22 Cal. App. (2d) 226, 70 Pac. (2d) 692, and are of the opinion that it appears, on an examination thereof, either that the facts upon which the decisions were based are not similar in their important essentials to those of the present case, or that the opinions were based upon principles of law not recognized by this state.

It appears to us that the evidence shows affirmatively and conclusively that defendant was within the true meaning of the words a ''charitable institution'' at the time of plaintiff's injury, and it was error for the court to submit to the jury the question of whether or not it was such an institution.

 But plaintiff also contends that, even though it be admitted that defendant was a charitable institution, nevertheless such institutions are bound to use due care in the selection of its employees and agents, and if it has failed to do so it must answer for the acts of such employees if they have actually been guilty of acts of negligence which cause damages to the beneficiaries of the institution. The rule of law just stated is undoubtedly correct. *Southern Methodist Hospital and Sanatorium* v. *Wilson, supra.* But we are unable to discover any evidence in the record sufficient to bring this case within the rule. There is nothing to show which particular employee was guilty of the undoubted negligence which caused plaintiff's injury. It does appear that three weeks prior to plaintiff's injury another baby named Zacharias was burned in a somewhat similar manner, and that a certain nurse named in the evidence assisted in the case of the baby mentioned. We think this is entirely insufficient to estab-

lish that, even assuming that the nurse mentioned was responsible for the burning of the Zacharias baby, that she was also responsible for the burning of plaintiff, or that the defendant did not use due care in her selection and retention. It is true that the cases of *Adams* v. *University Hospital,* 122 Mo. App. 675, 99 S. W. 453, and *Meyer* v. *McNutt Hospital,* 173 Cal. 156, 159 Pac. 436, hold that the doctrine of *res ipsa loquitur* is properly applied in such circumstances. We think the presumption, that the person who applied the hot-water bag to the patient, under circumstances such as set forth in those cases, and, indeed, in the present one, was negligent, is established by the rule of *res ipsa loquitur,* but we think it is going too far, even though we assume it also established that the particular nurse referred to in the present case was negligent with the Zacharias baby, to hold it also shows that the hospital had not used due care in the selection or retention of competent employees. Further, it was shown that all of the nurses employed by defendant were graduate and licensed nurses authorized by the state of Arizona to practice their profession. We think where it is shown by positive evidence that the nurses employed by a hospital are of this character, even if a presumption has arisen from the doctrine of *res ipsa loquitur* that the hospital has not used due care in the selection of a given employee, that presumption is entirely destroyed by the positive evidence, and, in order to overcome such evidence, there must be at least an affirmative showing by the plaintiff that defendant had knowledge of the previous negligence of the nurse, and, notwithstanding such knowledge, continued her employment.

We have examined the entire record with great care, and considered every case cited, and all the arguments of counsel. We recognize the unfortunate situation of the plaintiff; we realize that he has been scarred for

life through no fault of his own, but through the undoubted negligence of one of the employees of defendant. But under the law of Arizona, supported by the soundest considerations of public policy, we are of the opinion that the record shows affirmatively that defendant was, within the true meaning of the phrase, a "charitable institution" and that, being such, was only liable in case it appeared that it did not exercise due care in the choice of its nurses, and that, since it appears that all of its nurses were regularly licensed and registered by the state of Arizona, and there is no evidence that defendant ever knew any one of them was not competent in all respects, it is not legally responsible for the unfortunate situation in which plaintiff finds himself.

The judgment of the superior court of Pima county is reversed, and the case remanded, with instructions to enter judgment for defendant.

McALISTER, C. J., and ROSS, J., concur.