Submitted on briefs January 13; affirmed February 9; rehearing
denied March 23, 1943

BENTON COUNTY *v.* ALLEN ET AL.

(133 P. (2d) 991)

Before Bailey, Chief Justice, and Belt, Rossman, Kelly, Lusk, Brand and Hay, Associate Justices.

*Weatherford & Thompson,* of Albany, for appellant.

*Fred McHenry,* District Attorney, and *Walter T. Durgan,* both of Corvallis, for respondent.

HAY, J. These proceedings were instituted by Benton County in December, 1940, for the foreclosure of delinquent tax liens. One of the defendants is Corvallis General Hospital Association, which is incorporated under the laws of Oregon as a charitable corporation.

The corporation's property consists of certain real property, upon which is erected a hospital building, and personal property, comprising hospital equipment. It contends that this property is exempt from taxation under subd. 3, section 110-201, O. C. L. A., which reads as follows:

"Property exempt from taxation. The following property shall be exempt from taxation: * * *

"(3) The personal property of all literary, benevolent, charitable and scientific institutions incorporated within this state, and such real estate belonging to such institutions as shall be actually occupied for the purposes for which they were incorporated."

In the year 1923, certain citizens of Corvallis organized a corporation for the purpose of erecting and maintaining a hospital. This corporation was formed under the state laws respecting the organization of corporations for profit. The movement was apparently instigated and fostered by physicians of the community. Stock was sold to the general public, the physicians themselves subscribing for generous amounts. The hospital was erected, and the corporation operated it for some years. Financially, it operated at a loss, to the extent that its continued existence was seriously threatened. In 1926, upon the advice of counsel, some of the stockholders decided to organize a new corporation under the state laws governing the formation of charitable corporations. At that time, the stock corporation had capital stock outstanding of the par value of $49,620. Besides this, it had outstanding bonds for about $40,000, secured by a mortgage upon its real property. The charitable corporation was formed, and thereupon the stock corporation conveyed the hospital property and equipment to it, subject to the mortgage. Later, the charitable corporation issued bonds in the amount of the par value of the outstanding capital stock, or $49,600, and delivered them to a trustee for the stockholders. This bond issue was secured by a mortgage, which is a second lien upon the real property of the corporation. Bonds of this issue of the face value of $49,500 are still outstanding, one $100 bond having been donated to the corporation.

These bonds bear interest at the rate of 6% per annum, none of which has been paid.

The evidence shows that, since the formation of the pretended charitable corporation, the business has been operated at a profit, averaging about $2,000 a year. The profits have been applied from time to time toward payment of the first-mortgage indebtedness, which has now been reduced from the original $40,000 to $12,500. About $10,000 of this reduction reflects charitable gifts and bequests received by the corporation, but the remainder represents profit.

After hearing the evidence, the trial judge gave judgment and decree foreclosing plaintiff's lien for delinquent taxes, and the defendant appeals.

"Taxation is the rule, and exemption from taxation the exception." *Sisters of Mercy v. Lane County*, 123 Or. 144, 152, 261 P. 694; 26 R. C. L., Taxation, sec. 274.

■ The statute exempts the personal property of charitable corporations, and such of their real property as is actually occupied for the purposes for which they were incorporated. In order that the property may be exempt, however, it must fall strictly within the statute. *People ex rel. Thompson v. Ravenswood Hospital*, 238 Ill. 137, 87 N. E. 305; *Providence Bank v. Billings*, 4 Pet. (U. S.) 514, 7 L. Ed., 939; *County of Hennepin v. Bell*, 43 Minn. 344, 45 N. W. 615.

■ Hospitals, as such, are not necessarily public charities, and hence they enjoy no inherent exemption from taxation. *Sisters of Mercy v. Lane County*, supra. It must be conceded that many of the original stockholders in this case were activated by the highest motives in aiding in the organization of this hospital, which the city sorely needed, and that they regarded their stock subscriptions as in the nature of donations

to charity or as contributions toward the betterment of the community. Others, however, looked upon their subscriptions as mere investments.

■ For the purposes of the present case, a charity may be defined as "a gift to be applied, consistently with existing law, for the benefit of an indefinite number of persons, * * * by relieving their bodies from disease, suffering, or constraint." 6 Words and Phrases, Perm. Ed., 642. The purposes for which the defendant was incorporated are within this definition.

■ "A corporation, the object of which is to provide a general hospital for sick persons, having no capital stock nor provision for making dividends or profits, deriving its funds mainly from public and private charity, and holding them in trust for the object of sustaining the hospital, conducting its affairs for the purpose of administering to the comfort of the sick, without expectation or right on the part of those immediately interested in the corporation to receive compensation for their own benefit, is a public charitable institution. * * *" 10 Am. Jur., Charities, Sec. 135.

■ The articles of incorporation are prima facie evidence of the character of the corporation as a charitable institution, but such prima facie evidence may be rebutted by evidence that in fact the corporation has not lived up to its chartered objects. *Southern Methodist Hospital v. Wilson,* 45 Ariz. 507, 46 P. (2d) 118; Id., 51 Ariz. 424, 77 P. (2d) 458; *Levy v. Superior Ct.,* 74 Cal. App. 171, 239 P. 1100; *Hamilton v. Corvallis General Hospital,* 146 Or. 168, 30 P. (2d) 9.

The defendant relies upon the cases of *Sisters of Mercy v. Lane County,* supra, and *Waller v. Lane County,* 155 Or. 160, 63 P. (2d) 214. In the first of those cases, the objects and purposes of the corporation,

as expressed by its president, were to take care of the poor and sick, and to maintain schools and orphan asylums, homes for the aged, and hospitals. It had no capital stock. None of the officers received any profit. None of the Sisters, who performed much of the work of the hospital, received any salary, although there were some paid nurses who were not Sisters. Neither the Catholic Church nor any other institution received any money or income of the hospital. Any surplus income was used to improve the facilities of the corporation for rendering charitable services. Patients who were able to pay were required to do so, but poor and friendless patients were received without charge, without discrimination on account of race, creed or color, and were given the same care as was accorded to paying patients. The court held that those facts obviously determined the classification of the corporation as a charitable institution.

In the second case (*Waller v. Lane County*, supra), the court found that the hospital involved was operated in such manner that, irrespective of race, creed or color, persons without funds were received as patients, and were given the same care as those who were able to pay. The hospital was the property of Pacific Christian Hospital, a charitable corporation organized under state law. Its funds came from donations from various religious organizations and societies. The property was held to be exempt from taxation while owned by the corporation and operated for its charitable purposes.

■ It is well settled that the fact that fees are charged those patients who are able to pay does not derogate from the charitable character of the institution, provided the income so derived is used to maintain

the institution or extend its facilities devoted to charity, or for other charitable purposes. *Sisters of Mercy v. Lane County,* supra; Restatement, Trusts, sec. 376. The method of financing the corporation in the *Sisters of Mercy v. Lane County* case is not fully disclosed by the opinion, but the articles of incorporation show that, at the time of organization, it had about two thousand dollars in money, and that its only sources of income would be the moneys which might be derived from schools and hospitals, together with donations which might be made to it from time to time by the charitable. In sustaining the character of the Mercy Hospital as a charitable corporation, therefore, this court perhaps broadened the classical definition of such institutions, which included only such corporations as were constituted for the perpetual distribution of the free alms of the founders of them, to such purposes as they had directed. 10 Am. Jur., Charities, sec. 134. The Mercy Hospital obviously had insufficient means with which to build and equip a hospital. Its income came from its paying patients and from donations of the charitable, and was devoted to the maintenance of the hospital, any surplus going into improvements and ''to pay off the indebtedness''. The latter phrase is taken from the opinion of the court, and indicates, we think, that the corporation financed itself, at least in part, by borrowing. This is indicated further by the meager amount of its original capital.

It is contended on behalf of Benton County that the organization of the charitable corporation to take the place of the former corporation was a mere subterfuge; that in substance the original plan remained unchanged, in that the old stockholders still expected to derive a profit from the operation of the hospital; and that the

charitable corporation was formed simply for the purpose of avoiding payment of taxes. Moreover, under the reorganization scheme, the stockholders would be in a position of advantage over general creditors, in that they would have security for their investment.

The defendant insists, however, that there is no distinction between issuing bonds, in effect in payment for the hospital property, and borrowing money with which to build and equip a hospital. It argues that if a charitable corporation may borrow money for the purpose of building and equipping a hospital, which evidently it may (*Waller v. Lane County*, supra; *Sisters of Mercy v. Lane County*, supra), without losing its character as a charitable corporation, there is no reason why it may not issue bonds in consideration of a conveyance to it of a hospital already built and equipped. The distinction, however, is clear. The stockholders were in effect the old corporation, and are in fact the members of the new one. They had made a bad investment. The plan of organizing a charitable corporation was not conceived (at least chiefly) for the purpose of almsgiving, but in order that the hospital, through avoiding the burden of taxes, might be enabled to operate at a profit, and so continue in operation, so that peradventure in time the stockholders might recover the amount of their investment. Moreover, although the hospital was a losing venture, they in effect sold the property to the new corporation at its full cost or value, and even made provision for the payment of interest to themselves out of the profits of operation.

In the case of *Hamilton v. Corvallis General Hospital Association*, (the same defendant as in the present case), supra, this court, in ruling that the question of whether or not the defendant was a charitable corpora-

tion should have been submitted to the jury, commented as follows:

"We are of the opinion that the trial court did not err in submitting to the jury the question of whether the defendant corporation was a strictly charitable institution or was being operated for profit in the interest and for the benefit of the stockholders of the prior corporation, after those stockholders had become the owners and holders of approximately $50,000 worth of defendant's second mortgage bonds. In view of the record it can not be said that the defendant corporation was strictly a charitable organization. It is not necessary to reiterate the facts hereinbefore pointed out from which the jury might at least infer that the defendant corporation was being operated for the benefit of certain individuals. The question of whether the defendant corporation was a charitable institution or was being conducted for profit was, by appropriate instructions, submitted to the jury and no exception was taken to those instructions."

"*  *  *  Apparently the stockholders of the predecessor corporation, in the case at bar, in making the transfer to the new corporation dealt with some of the stockholders of the former corporation who had become the founders and trustees of the succeeding organization. From the evidence it might be inferred that one of the principal purposes in forming the new corporation, was through the elimination of taxes and other expenses, to enable the stockholders of the former corporation to be repaid the par value of their stock. By this arrangement such stockholders became preferred creditors, whereas under the original plan their rights had been subordinate to those of all creditors."

The only justification for the exemption from taxation of property which has been devoted to charitable purposes is that the operation of a public charity tends to minimize the expenses of government. In this con-

nection some courts have defined charity narrowly. See *People ex rel. Medical Society of Kings County v. Neff*, 34 App. Div. 83, 53 N. Y. Supp. 1077; *Cartaret Academy v. State Board of Taxes,* 102 N. J. L. 525, 133 A. 886, 887. The exigencies of frontier life, however, no doubt caused western courts to take a broader and more generous view. Particularly was this true in relation to the establishment of hospitals, which, under frontier conditions, were greatly needed, and public policy encouraged their establishment by exempting their property from taxation where they could, even in a slight degree, qualify as charitable institutions. It is perhaps impossible to establish a definite yardstick; each case must be considered upon its own facts. From *Southern Methodist Hospital v. Wilson,* supra, we quote:

"* * * Is there a definite test which can be given? If the purpose of the institution is one which is recognized in law as charitable, and if it is not maintained for the private gain, profit, or advantage of its organizers, officers, or owners, directly or indirectly, we think the institution is properly characterized as a charitable one, notwithstanding the fact that it charges for most, if not all, of the services which it may render, so long as its receipts are devoted to the necessary maintenance of the institution and the carrying out of the purpose for which it was organized. * * *"

That case, citing *McDonald v. Mass. General Hospital*, 120 Mass. 432, 21 Am. Rep. 529, adopts, as the vital point of the test, the italicized portion of a quotation therefrom as follows:

"The corporation has no capital stock, no provision for making dividends or profits, and whatever it may receive from any source it holds in trust to be devoted to the object of sustaining the hospital

and increasing its benefit to the public, by extending or improving its accommodations and diminishing its expenses. Its funds are derived mainly from public and private charity; its affairs are conducted for a great public purpose, that of administering to the comfort of the sick, *without any expectation, on the part of those immediately interested in the corporation, of receiving any compensation which will inure to their own benefit, and without any right to receive such compensation.* This establishes its character as a public charity.''

Moreover, citing *Hamilton v. Corvallis General Hospital Association,* supra, the opinion comments upon the reorganization scheme under consideration here, tacitly indicating that such scheme had the effect of stripping the defendant of its character as a charitable institution.

In its operation, this hospital has been conducted as a general hospital in competition with non-charitable hospitals in the community. Patients who are able to pay are required to do so, and the rates charged are similar to those charged by the non-charitable hospitals. The evidence is somewhat conflicting upon the question of whether or not the hospital receives and cares for patients without means, but we are satisfied that on many occasions it has done so, and there is credible testimony in the record that such is its practice. Reduced rates are accorded to county relief patients and to patients hospitalized by the State Industrial Accident Commission. The non-charitable hospitals do likewise. There is some evidence indicating that such reduced rates are less than the per-patient cost of hospital care.

The defendant hospital maintains a medical staff, and physicians who practice in the hospital are re-

quired, under the by-laws of the corporation, to pay for the privilege. The sum which such physicians had to pay was originally fixed at $500, but afterwards raised to $1,000. Under the by-laws, physicians who were on the hospital staff prior to December, 1926, (that is to say, prior to the organization of the charitable organization), are not required to pay the fee which is exacted of others. It might be argued that this exemption indicates that the corporation is operated to some extent for the private profit of those pioneer physicians who founded the hospital, but, bearing in mind that the hospital was in operation for some three years before the reorganization and that some control over the personnel of the medical staff by the trustees of the hospital is desirable, we think that the preference which was thus given to the pioneer physicians, whose medical and surgical skill and whose ethical character were known, in itself, would not affect the corporation's charitable character.

■ There is evidence that the corporation considers its second-mortgage bonds to be without value. They are, however, outstanding and a lien upon the hospital's property. Continued reduction of the first-mortgage indebtedness is increasing their value. We cannot say, from the evidence, that "those immediately interested in the corporation" do not expect to receive compensation, by way of repayment of their bonds with interest, from the profits of its operation. Certainly, by the terms of the bonds and of the mortgage securing them, they have a right to receive such compensation. To say that, in receiving repayment of their investment, with interest, (or in retaining the right to demand such repayment), they take no more than that to which they are justly entitled, is to ignore the fact that their

original investment was a losing venture. It is immaterial that the corporation says that its bonds are of no value and that it does not intend to pay them. The bondholders have not said so, and they alone can. These facts, in our opinion, are fatal to the contention that the corporation is in fact a charitable one. *Southern Methodist Hospital v. Wilson,* supra; *Hamilton v. Corvallis Hospital,* supra. Hence, there is no reason in law why its property should be exempt from taxation.

The judgment and decree of the lower court are affirmed.

---

BELT, J. (dissenting) : In my opinion, the defendant hospital association is a charitable institution and therefore, by virtue of § 110-201 (3) O. C. L. A., is exempt from taxation. The contention of the plaintiff that the defendant hospital, although organized in 1926 as an eleemosynary institution, is being conducted as a profit-making enterprise in the interests of its second mortgage bondholders and as a subterfuge to evade payment of taxes, has no foundation in fact and is unjust.

The hospital, as reorganized, has no capital stock and no provision has been made for the distribution of dividends or profits. Its purpose, as stated in its articles of incorporation and by-laws, is to care for the sick, distressed, and injured. Any profits are applied to reduce its indebtedness and to improve the hospital service to the community. The mere fact that the second mortgage bondholders may, in the years to come, be paid what is legally due them does not change the character of the hospital as a charitable institution. Payment of what is due the original stockholders is not *compensation* to them. What difference in principle

is there between payment of the bonds and of any other indebtedness of the association? As a matter of fact, there has been no payment of principal or interest to the holders of the second mortgage bonds and, according to the undisputed evidence, there is no intention in the future to thus apply the revenues of the hospital. Let it be remembered that these public-spirited citizens exchanged their stock for bonds representing actual money put into the construction of the hospital. The great majority of those who purchased stock in 1923 in order to build a hospital were not thinking in terms of dividends. They were actuated by the highest and best of motives. They did not even consider the purchase of such bonds as an investment. Hospitals are generally not money making institutions.

In 1926 the hospital was rapidly going on the rocks and had been for some time prior thereto. It was then that the reorganization plan was conceived. When the stock was exchanged for bonds at that time, will it be argued that these men had in mind some scheme to operate the hospital as a pretended charitable institution? As long as they held the stock there was a bare possibility of profits or dividends; when the stock was exchanged for bonds there was none.

Counsel for respondent Benton County urge that the position of the second mortgage bondholders is different from the first mortgage bondholders and, since they were stockholders of the original corporation and bondholders of the second corporation, the operation of the hospital is for their profit. Assume it is true that they will ultimately be paid, as well as the first bondholders, does this in any way interfere with the charitable nature of the hospital? If it does, then it is the method of financing the hospital and not

the method of its operation that is the test to determine whether or not it is a charitable concern.

I agree that, if the hospital were operated for profit and gain, it would not be a charitable institution, although its articles of incorporation declared its purpose to be a charity. It is the purpose for which the property of the association is actually used that determines its classification, so far as the right to exemption is concerned: Cooley on Taxation (4 Ed.) § 739. As stated in 30 C. J. 462 and cited with approval in *Corporation of Sisters of Mercy v. Lane Co.*, 123 Or. 144, 261 P. 694:

> "The test which determines whether a hospital is charitable or otherwise is in its purpose, that is whether it is maintained for gain, profit, or advantage, or not. * * * Where a hospital can otherwise be classed as a charitable institution, the fact that patients who are able to pay are required to do so does not deprive it of its charitable character."

We would inquire then how this hospital was conducted or operated. The evidence shows beyond doubt that the doors of the hospital were open alike to the rich and the poor. No patient in need of treatment was ever turned away for lack of funds. The mere fact that those who were able to pay were charged for services rendered or that efforts were made to protect the hospital against "dead beats" does not change the character of the hospital as a charitable institution.

What does the evidence show as to the manner in which the hospital was operated?

Mr. J. F. Porter, president of the board of trustees and one of the members of the board, who borrowed

$800 at the bank on his personal note "to keep the thing going" testified:

> "It has been the instruction of the Board of Trustees, when I was the president, whether C. W. Woodcock was president or Bob Johnson, that no one, regardless of who or where he came from ever be denied admission to the hospital. * * * we have never refused admittance to a patient, and I am sure that has been the rule ever since the hospital was organized.
>
> "Q. Is there anybody that has made any money or under this present corporation is there any way for anyone to make any money for profit out of the corporation? A. No, no, it isn't the intention to make any money."

F. L. Walker, who has been manager of the hospital since 1933 and whose efficient service enabled it to survive, testified:

> "Q. Then you have never in a single instance that you know of since you have been there where a person needed physical—surgical or medical care, has been turned away because of lack of funds? A. Never, absolutely, no."

Dr. R. L. Bosworth, a physician and surgeon who has practiced in Corvallis for approximately 30 years, testified:

> "There was never any one turned away from the hospital for the lack of funds. Neither is there in Benton County any one turned down by any physician for medical care. It makes no difference in the hospital in Benton County as to whether a person can pay for his service or not. He gets his service, and equally good service, as though he were paying the price."

Dr. Henry Garnjobst, a physician and surgeon who has practiced in Corvallis since 1923, testified:

"Q. Well, just state whether any of your patients have been denied the service, hospitalization for surgical work in the hospital because of lack of funds or because of poverty? A. No, never have.

"Q. Has there been any distinction of color or creed as to who may be admitted into the hospital? A. No.

"Q. State whether or not the hospital has been open and has received all your patients irrespective of their ability to pay during the time that you have practiced in Corvallis? A. There has never been any discrimination."

Dr. E. L. Potter, who has been a professor at Oregon State College for over 30 years and a member of the board of trustees of the hospital for 13 years, testified:

"Q. What is the fact about whether there is any discrimination as to creeds, anything of that kind? That is, will a colored boy or a Chinese boy or girl be admitted the same as a white person? A. Oh, yes. If not, it is certainly contrary to Board rules.

"Q. Can anyone in any way make a profit through any individual? A. No, you see we have no capital stock upon which we can pay dividends. We have no legal means for disbursing earnings to anybody, so that any earnings must go into the hospital for improvements or lowering rates, betterment to the community, because we have no legal outlet. There is no stock; we can't pay dividends and there is no legal means to pay it, but of course those of us working for the public benefit don't desire to pay it, but it is not so organized to pay it."

*Hamilton v. Corvallis General Hospital,* 146 Or. 168, 30 P. (2d) 9, has no application to the facts in this case. In the previous case—an action for personal injuries—the court held it to be a question of fact for the jury whether the defendant hospital was a charitable institution. Here we are concerned not with a tort but with a question of tax exemption.

In my opinion, the hospital has functioned as a charitable institution and should be exempt from payment of taxes.

The decree should be reversed.