IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| CENTRAL OREGON LOCAVORE, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 170319G |
| | ) | |
| v. | ) | |
| | ) | |
| DESCHUTES COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION[1]** |

This property tax exemption case is before the court on cross-motions for decision without trial. Plaintiff ("Locavore") appealed the denial of its claim for exemption of the subject property by Defendant (the county) for the 2016–17 tax year.[2] The court received the parties' Stipulation of Facts, to which was attached exhibits 1 to 4, and the Declaration of Nicolle Timm-Branch, to which was attached exhibits 6 to 10.[3] The parties agreed to forego trial and to receive a decision based on the stipulations and documentary evidence.

## I. STATEMENT OF FACTS

The facts are drawn from the parties' Stipulation of Facts and documents submitted by Locavore. The county "does not quibble with the facts as presented by Locavore's motion, and appreciates the additional details regarding Locavore's programs and the use of the Marketplace." (Def's Response at 1.)

/ / /

---

[1] This Final Decision incorporates without change the court's Decision, entered November 9, 2018. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] The subject is identified as Account 100691.

[3] No exhibit 5 was received.

Locavore is a nonprofit corporation selling locally produced foods at its grocery store in Bend and engaging in other activities related to local farming. Locavore's bylaws state its purpose as follows:

> "The corporation's primary purpose shall be to educate the Central Oregon community about the health and social benefits of fresh and nutritious food sustainably produced by local farmers and ranchers by improving access to fresh, in-season, nutrient-dense local food to all members of the community, especially low-income families; establishing outreach programs that target youth, low-income families, and pregnant and breastfeeding mothers; and providing job skill training relevant to local food production and distribution to low-income youth."

(Ex 2 at 1.)

The parties refer to the subject property as the Marketplace. Locavore describes its use of the Marketplace as follows:

> "The Marketplace has approximately 3,140 square feet, approximately half of which is operated as a grocery store specializing in locally produced meats, produce, and other local products. Approximately one-quarter of the Marketplace is an open area that is used for many different purposes. For example, it is used for Locavore's classes and community events, it is used for board of director meetings, committee meetings, employee meetings, and quarterly meetings with farmers to discuss and coordinate crop selection. The same area is used by Locavore volunteers and employees to weigh, package and price product for sale in the Marketplace, and occasionally to store goods and equipment. Approximately one-quarter of the Marketplace is used for food storage (including walk-in cooler and refrigerator space). In the same area there is a closet-sized office used for administrative functions, and in the same area there is a space dedicated to egg candling and processing, and storing equipment used for Locavore events such Meet Your Farmer, WWOLF [Willing Workers on Local Farms], and Farm Kids!"

(Ptf's Mot at 3 (citations omitted).) Locavore leased the subject property during the tax year at issue.

According to Locavore's founder, "Locavore provides an incubation marketplace for new farmers, ranchers, and value-added producers" because it "does not require minimum inventory or exclusivity contracts." (Timm-Branch Decl, ¶ 18.) Small farmers and ranchers in Central

Oregon face special problems due to a short growing season, dependence on irrigation, and lack of a reliable wholesale infrastructure. (Ptf's Mot at 4.) Locavore is the only retail outlet available to "the vast majority" of those farmers and ranchers. (Timm-Branch Decl, ¶ 17.) Locavore assists farmers with price setting and crop planning, provides product-packaging and egg-candling services, and hosts herd-share and community-supported-agriculture (CSA) arrangements. (*Id.*, ¶¶ 19–20, 22–23.) In addition, "Locavore typically returns 15% to 25% more of gross sales to producers than national and regional grocery stores." (*Id.*, ¶ 21.)

Locavore submitted a 2017 economic impact study describing it as "a regional wholesaler * * * which sells farm-direct by consignment[.]"[4] (Timm-Branch Decl, Ex 7 at 8.) Locavore charges farmers and ranchers for selling their products at the Marketplace "by requiring a $5-per-month fee and by keeping approximately 30% of sales." (Ptf's Mot at 18.) Locavore also charges farmers who participate in herd-share and CSA arrangements $25 to $50 per month for use of its facilities. (Timm-Branch Decl, ¶ 22.) Locavore's receipts from the Marketplace were not sufficient to cover its operating expenses during the tax year at issue. (Ptf's Mot at 18.)

The bulk of Locavore's 2016–17 revenue came from market sales: 83 percent during calendar year 2016 and 74 percent during 2017. (Timm-Branch Decl, Ex 6.) Another 13 to 15 percent came from dinners and events such as "Meet Your Farmer." (*Id.*, Ex 6; *Id.*, ¶ 8.) Nine percent of its 2017 revenue consisted of donations, mostly made in response to a fundraising campaign after a budget shortfall. (*Id.*) Approximately ninety percent of Locavore's program expenses arose from stocking and staffing the Marketplace, with the remaining expenditures going to fundraising events. (*Id.*, Ex. 6.)

---

[4] Mallory Rahe *et al*, *Economic Impact of Local Food Producers in Central Oregon* (2017), *available at* https://appliedecon.oregonstate.edu/biblio/economic-impact-local-food-producers-central-oregon.

Locavore's paid staff consisted of a manager and four to six employees who performed most of the day-to-day functions of the Marketplace. (Timm-Branch Decl, ¶ 28.) Locavore's directors and officers were volunteers, and Locavore "relies heavily on volunteers to work in the Marketplace." (*Id.*) Volunteers' work in the Marketplace included building repair and maintenance, basic cleaning, egg candling, and product packaging. (*Id.*, ¶¶ 7, 20.) In addition, "the Farm Kids! and WWOLF programs are organized and staffed solely by volunteers." (*Id.*, ¶ 28.)

Farm Kids! was an educational program operated in conjunction with Bend–La Pine Schools that included field trips to local farms and classroom presentations. (Timm-Branch Decl, ¶ 25.) "Nearly all" of the schools participating in the program were low-income schools and were provided scholarships. (*Id.*) During 2016, the program reached 17 schools and approximately 782 children. (*Id.*) The county concedes that Farm Kids! was a form of " 'gifts and giving,' at least from the general public's perspective." (Def's Response at 6.)

WWOLF—Willing Workers on Local Farms—was a volunteer labor program assisting farmers and ranchers at key times, such as planting and harvesting. (Timm-Branch Decl, ¶ 24.) "During 2016 Locavore provided approximately 900 labor hours over 8 events, and during 2017 Locavore provided approximately 618 labor hours, not including the time spent planning and coordinating the event in advance." (*Id.*) Locavore favored "the poorer farmers and ranchers" when selecting WWOLF projects. (*Id.*, ¶ 29.)

Locavore's founder identified two additional activities, the Central Oregon Edible Adventure Crew and Locavore Food School but neither party argued those activities were significant enough to affect the character of Locavore as an institution or of Locavore's use of the subject property. (Timm-Branch Decl, ¶¶ 26–27.)

Additional facts are included where pertinent in the analysis.

## II. ANALYSIS

The ultimate issue is whether the subject property—Locavore's Marketplace—was exempt from taxation. Property leased by a charitable institution may qualify for tax exemption on the same basis as property owned by a charitable institution. *See* ORS 307.112(1).[5,6] ORS 307.130(2) provides, in pertinent part:

> "(2) Upon compliance with ORS 307.162, the following property owned or being purchased by art museums, volunteer fire departments, or incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

> "(a) Except as provided in ORS 748.414, only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."

Thus, for property to be tax-exempt under ORS 307.112 and 307.130(2)(a), it must be leased by a qualifying organization and used in that organization's tax-exempt work.

Here, Locavore alleges that it is a charitable institution and that the Marketplace was actually and exclusively used in its charitable work. The county disputes both of those allegations.

A.    *Charitable Institution*

Property exempt under ORS 307.130(2) must be held by an "incorporated literary, benevolent, charitable [or] scientific institution[.]" Here, it is undisputed that Locavore is incorporated in the proper form. The question is whether Locavore's purpose and activity qualify it as a "charitable institution."

/ / /

---

[5] Other conditions for exemption of leased property specific to ORS 307.112 are not at issue here.

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2015.

While a charitable purpose stated in a corporation's articles and bylaws is *prima facie* evidence of charitable character, that *prima facie* evidence may be rebutted by evidence that an organization's conduct does not align with its stated goal. *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev. (Dove Lewis)*, 301 Or 423, 427, 723 P2d 320 (1986); *Benton Co. v. Allen et al.*, 170 Or 481, 485, 133 P2d 991 (1943). Likewise, evidence of charitable conduct may supply what is missing in an inconclusive statement of charitable purpose. *See Dove Lewis*, 301 Or at 427. Thus, a corporation's charitable nature is revealed by its stated object and its conduct. Specifically, a charitable institution (1) has charity as its primary object, (2) performs its work in a manner that furthers its charitable object, and (3) performs in a way involving "a gift or giving." *SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or. 82, 89, 817 P2d 1292 (1991); *see also* OAR 150-307-0120 (summarizing tests applied by Oregon courts). An organization's character is shown by its primary rather than its "incidental or minor activities." *Oregon Stamp Society v. Commission*, 1 OTR 190, 204 (1963), *quoted in Mazamas v. Dept. of Rev.*, 12 OTR 414, 417 (1993) (holding mountaineering lodge was primarily for members' benefit despite "some charitable aspects," such as reduced rates for youth groups and free use for search-and-rescue operations).

1.      *Charitable object and performance*

A charitable institution has a charitable object. While there is no definitive list of beneficial charitable purposes, examples from the Restatement of Trusts include: " ' (a) the relief of poverty; (b) the advancement of education; (c) the advancement of religion; (d) the promotion of health; (e) governmental or municipal purposes; (f) other purposes the accomplishment of which is beneficial to the community.' " *Friendsview Manor v. State Tax Comm'n*, 247 Or 94, 99, 420 P2d 77 (1966), *adh'd to on reh'g*, 247 Or 94, 427 P2d 417 (1967) (quoting Restatement

(Second), Trusts § 368). Receipt of donations and employment of volunteer labor are factors tending to show that the wider community considers an organization's object beneficial. *Cf. Rigas Maja, Inc. v. Dept. of Rev.*, 12 OTR 471, 475 (1993) (holding adult foster home charitable where services were provided by volunteer labor and partly funded by cash donations).

Organizations that are charitable in the legal sense—public charities—are "organized with the dominant purpose of doing good to others rather than for the convenience of their members." *YMCA v. Dept. of Rev.*, 308 Or 644, 654, 784 P2d 1086 (1989) (quoting *Kappa Gamma Rho v. Marion County*, 130 Or 165, 176, 279 P 555 (1929)); *accord* OAR 150-307-0120(4)(b) (charitable institution's activity is "for the direct good or benefit of the public or community at large"). As a general principle, public charities aim to benefit classes of people rather than particular individuals: "Charity begins where certainty in beneficiaries ends." *Tripp v. Comm'r*, 22 TCM (CCH) 1225 (TC 1963), *aff'd*, 337 F2d 432 (7th Cir 1964) (citing *Russell v. Allen*, 107 US 163, 167, 2 S Ct 327, 27 L Ed 397 (1883)).

In this case, Locavore's bylaws articulate a purpose broadly related to education and support for the poor. The bylaws state that Locavore's purpose is to educate about and improve access to food produced by "local farmers and ranchers" and to train low-income youth in job skills relevant to local food production. In particular, the bylaws state that Locavore seeks to improve access to such food for "low-income families" and to target its outreach toward "youth, low-income families, and pregnant and breastfeeding mothers[.]"

The county argues that Locavore's activity primarily benefits farmers and ranchers and questions whether "supporting the profitability of the Central Oregon agricultural community educates the broader Central Oregon community or is otherwise a public benefit." (Def's Mot at 4.) According to the county, those farmers and ranchers "might as well be considered 'members'

because they are clearly distinguishable from the general public." (*Id.* at 5.)

Farmers and ranchers clearly benefited from Locavore's activity. Although Locavore's bylaws frame its mission in terms of an educational outreach to the general public, the evidence indicates Locavore accomplished its mission primarily through the Marketplace. Locavore devoted all of its employees and approximately 90 percent of its program expenditures to running the Marketplace; the other 10 percent went to fundraising events. Locavore describes the Marketplace as a grocery store, and no evidence suggests that products were ever given away or sold at a discount. Proceeds from Marketplace sales went to Locavore and to farmers and ranchers, and Marketplace services—packaging, egg candling, crop planning, and price setting— generally benefited agricultural enterprises. Likewise, the WWOLF program, although it was a relatively small commitment for Locavore in comparison to the Marketplace, was operated for the benefit of farmers and ranchers—particularly "the poorer farmers and ranchers."

The FarmKids! program was an educational effort conceded by the county to have been directed toward the general public. In conjunction with various other entities, Locavore dispatched volunteers to 17 schools through FarmKids! in 2016. However, Locavore's volunteers performed 35 to 45 hours of work every week at the Marketplace just packaging food and candling eggs, plus additional repair and maintenance work. (Timm-Branch Decl, ¶¶ 7,20, 23.) All of that volunteer labor was in addition to the work of Locavore's paid staff. As described above, operating the Marketplace and fundraising accounted for all of Locavore's program expenditures. Compared to the Marketplace, FarmKids! was a minor activity of Locavore. The court finds that the primary object of Locavore's activities was the benefit of local farmers and ranchers.

/ / /

Although the county questions whether activity benefiting businesses can be for the public benefit, it is unclear why such activity is inconsistent with benefiting the wider public. Numerous federal, state, and local government programs exist to provide financial assistance in aid of economic development—including support for "beginning farmers and the growth of the local market agricultural sector." ORS 285A.420(2). The donations Locavore received in response to its fundraising efforts and the volunteer hours given are some indication that the public perceived a benefit in supporting local agriculture. It cannot be said as a matter of law that a purpose of benefiting businesses or farmers is not beneficial to the general public.

Nor are farmers "effectively" members of Locavore because they are beneficiaries of its activity. Nothing in the evidence suggests that the farmers helped by Locavore controlled Locavore or had any right to Locavore's assistance. To the contrary, the evidence suggests that access to the Marketplace was available to all farmers and ranchers, and that priority for WWOLF services was given to farmers in economic need rather than, for example, Locavore's donors. According to its articles of incorporation, Locavore's assets are to be distributed for exempt purposes upon dissolution, not returned to its donors or otherwise spent for their particular benefit. (Stip Facts, Ex 1.) If Locavore gave something of value to farmers generally, that would not make the farmers effective members—rather, it would put them in the same position as any recipients of charity.

Perhaps the concern underlying the county's charge that farmers were effectively Locavore members is that farmers may have paid for what they got from Locavore through fees and charges. In that case, the more pertinent inquiry will be whether Locavore's activity involved a gift or giving. Locavore's object may or may not have been charitable; the fact that it primarily benefited farmers does not decide the question.

2.    *Gift or Giving*

In property tax exemption cases, typically "the crucial consideration is the element of a gift or giving." *Dove Lewis*, 301 Or at 428.  It is giving that distinguishes the benevolent from the merely beneficial.  *Cf. Kappa Gamma Rho*, 130 Or at 176.  "This element of gift or giving is giving something of value to a recipient with no expectation of compensation or remuneration."  OAR 150-307-120(4)(d), *quoted in SW Oregon Pub. Def. Services*, 312 Or at 91.  As a result, the question is "whether, so far as the recipient is concerned, the taxpayer's services are given to the recipients with strings attached."  *SW Oregon Pub. Def. Services*, 312 Or at 91–92 (original emphasis removed).

An organization that charges fees may engage in giving "by providing products or services to those in need at below-market rates."  *Serenity Lane, Inc. v. Lane County Assessor*, 21 OTR 229, 240 (2013); OAR 150-307-120(4)(d).  Such organizations more clearly manifest a charitable character where their receipts are reinvested in operations, where all patrons receive the same treatment regardless of ability to pay and "without discrimination as to race, color or creed," and where charges are reduced or waived for the poor and indigent.  *See Serenity Lane*, 21 OTR at 236; OAR 150-307-120(4)(d)(C)(iii).  A fee schedule structured to cover all costs—and thus minimize dependence on donations—may indicate an organization is not charitable, although such a fee schedule is just one factor to be considered.  *See Dove Lewis*, 301 Or at 430–31.

Here, Locavore argues that three of its activities involved giving: FarmKids!, WWOLF, and the Marketplace.  FarmKids! and WWOLF did involve giving, and to that extent it could be said they "weigh" in Locavore's favor.  However, they were minor activities compared to the Marketplace and, as such, do not determine Locavore's character.  *See Mazamas*, 12 OTR at 417.  The "weight" of the Marketplace will tip the scales regardless of the lesser activities.

Locavore argues that the Marketplace gave something of value to farmers by allowing

them to sell goods for a nominal fee of $5 per month, by providing various services—such as packaging and egg candling—at no additional cost, and by giving farmers a larger share of the gross receipts than they would have received from conventional grocery stores.  Locavore also argues that the fact it operated at a loss shows its activities involved giving.

Considering the last point first, it is undeniable that Marketplace costs exceeded revenue during the period at issue.  The Marketplace had net losses of approximately $55,000 in 2016 and $27,000 in 2017.  During that same period, its Marketplace revenues increased by approximately $40,000.  (Ex 6 at 2.)  That evidence tends to show the Marketplace's losses were not due to a fee structure deliberately pitched below its costs.  *Cf. Dove Lewis*, 301 Or at 430–31.  Instead, the Marketplace's losses declined as its sales increased.  No evidence indicated that Locavore did not anticipate increasing its sales volume until it was able to cover overhead.  To the contrary, Locavore stated that its farm product sales had increased "significantly" since it moved out of the smaller building it occupied in 2014.  (Ptf's Mot at 4–5.)  On that evidence, the Marketplace appears more in the character of an expanding business not yet breaking even rather than a charity aiming only to partially defray its expenses.  *Cf. Serenity Lane*, 21 OTR at 238–39 (finding below-market charges to poorer patients for therapeutic reasons helped demonstrate gift or giving).

Locavore's other points implicitly or explicitly compare its Marketplace to conventional grocery stores.  In exchange for a nominal up-front fee, Locavore provides packaging and other sale-preparation services to its producers that they presumably would not receive from conventional grocery stores.  In addition, Locavore's producers received a greater percentage of the gross receipts than they would from conventional grocery stores.  However, the evidence indicates Locavore's business model differed significantly from that of conventional grocery stores.  The economic impact study described Locavore as "a regional wholesaler * * * which

sells farm-direct by consignment," and placed Locavore in a different category from both "grocery stores" and "other wholesale." (Timm-Branch Decl, Ex 7 at 19.) The evidence does not show how Locavore's sale-preparation services or Locavore's percentage fee compared to the commercial transactions between farmers and conventional grocery stores.

The evidence does not show a gift or giving in Locavore's operation of the Marketplace. Because operating the Marketplace was Locavore's most significant activity by a wide margin, its lack of giving shows Locavore lacked the character of a public charity.

B.  *Actual Use*

Because Locavore was not a charitable institution within the meaning of ORS 307.130, consideration of whether any portion of the subject property was used for charitable purposes is unnecessary.

### III.  CONCLUSION

The evidence shows that Locavore's purpose was beneficial to Central Oregon farmers and ranchers, but did not show that Locavore's primary activity—its Marketplace—included an element of "gift or giving." Now, therefore,

IT IS THE DECISION OF THIS COURT that Locavore's appeal is denied.

Dated this ____ day of November, 2018.

_____
POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by __mailing to: 1163 State Street, Salem, OR 97301-2563__; or by __hand delivery__ to: Fourth Floor, 1241 State Street, Salem, OR. Your complaint must be submitted within __60__ days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on November 27, 2018.*